IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| United States of America, | ) | Criminal. No.:  1:21-cr-640 |
| | ) | |
| vs. | ) | |
| | ) | |
| GEORGE TENNEY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**SENTENCING MEMORANDUM AND MOTION FOR VARIANCE**

<u>George Tenney</u>

When he decided to travel from South Carolina to Washington D.C. on January 6, 2021, George Tenney did not realize that he was setting out on a journey that would result in the complete dismantling of his life and livelihood. At the time, he had a good job working for Sysco, making a good salary with benefits and a retirement plan. His employment with Sysco started in 2018 and had come about after 17 years working as a chef for country clubs and restaurants in South Carolina, Arizona, Oregon, and North Carolina.

All of that is gone now as he tries to make ends meet as the owner, cook and operator at a small take-out restaurant in Anderson, South Carolina. He was fired from Sysco after his arrest in this case. Mr. Tenney works long hours for the restaurant to support his two children from a previous marriage, ages 6 and 9. He shares joint custody of these children and is also raising his 1 month-old son with

his fiancée. He co-owns his restaurant with his fiancée but the family depends entirely on him to run the business because his fiancée is home with their infant son.

Mr. Tenney has worked hard while out on bond for 17 months to reform himself. He is profoundly remorseful for his participation in the events of January 6 and respectfully asks this Honorable Court to consider a sentence below his guideline range. His efforts to reform and the serious consequences his has already incurred in his personal life make a guideline sentence unnecessary to achieve a just sentence.

According to the PSR, Mr. Tenney is a criminal history category I. His actions on January 6 were an extreme aberration from his normal behavior. He was taken in by the rhetoric of politicians and sincerely believed the participants were acting in the best interest of the United States. His gullibility led to the greatest mistake of his life, one that will have lasting consequence for him. He knows now that he was wrong, in his beliefs and in his actions. He is deeply embarrassed and remorseful that he participated in something that harmed so many in law enforcement, a profession he profoundly respects and supports.

He realizes now that he ruined his career, embarrassed his family, put his freedom in jeopardy and became a convicted felon all in service of an absurd lie. Like most of the people protesting in the Capitol on January 6, he believed in dangerous and false narratives, picked up through internet chats, podcasts and the words of high-level government officials, including the President of the United

States. But most importantly for this Honorable Court's consideration, Mr. Tenney has come to realize just how misguided he was on that day.

George Tenney and His Family





Sentencing Guidelines: Objection to 8-level Enhancement

The Presentence Investigation Report (PSR) provides a guideline calculation of 41 – 51 months for Mr. Tenney. This calculation is based in part on an 8-level

enhancement under United States Sentencing Guidelines (USSG) §2J1.2(b)(1)(B) for "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice…" PSR, ¶55. If the 8-level enhancement were not applied, Mr. Tenney's guidelines would be 21 – 27 months based on an offense level 16 and criminal history category I.

Mr. Tenney objects to the application of the 8-level enhancement on the grounds that he did not cause injury to anyone or threaten to cause injury to anyone, and he did not intentionally damage property.

Mr. Tenney fully admits to his actions on January 6. He entered the Capitol building through an open door, he walked around the Capitol building and he opened a door in the rotunda area to allow others into the building. During his effort to open the door in the rotunda, he admits there were several instances of incidental physical contact with capitol police and others involved in the breach of the capitol. This physical contact with others did not cause injury and Mr. Tenney did not threaten to cause injury or property damage. He did not want to hurt any of the officials working to protect the Capitol.

The video evidence provided by the government, along with interviews conducted by the government with capitol police officers, referred to in discovery as "B.A." and "J.G." support the objection to the 8-level enhancement.

*Rotunda Video*

When footage from the CCTV in the rotunda begins, a large crowd is

gathered outside the door, visible from the inside through 4 windows on the doors. At the 2 minute, 9 second mark, a window on the door is smashed from the outside.

The crowd remains gathered outside the door, attempting to break through the windows for another 4 minutes until, at the 6 minute, 25 second mark, there is a flash in the crowd and plume of smoke permeates throughout the people gathered outside. The scene becomes increasingly chaotic as the crowd clashes with Capitol Police in riot gear.

At the 6 minute, 43 second mark, George Tenney enters the frame. He is inside the rotunda, having entered the capitol from another location through an open door. He walks directly to the doors which now have two smashed windows. The crowd outside is in a state of complete chaos. Mr. Tenney tries unsuccessfully to push the doors open. He then says something to an unknown person overhead. He then pushes the door again and it opens outward toward the crowd.

Within seconds of the door opening, a person who appears to be an employee of the capitol building runs to the door and pulls Mr. Tenney away from the door. Mr. Tenney backs off for a moment and then presses against the door again, immediately beside the capitol employee. Mr. Tenney and the employee exchange words, and people begin to filter into the building.

At no point did Mr. Tenney assault or threaten this employee. Rather, Mr. Tenney seems concerned with letting people into the building who are pressed against the door with two broken windows.

*Officer B.A.*

At the 7 minute, 46 second mark, an officer in riot gear, Officer B.A., pushes through the crowd, into the rotunda. Mr. Tenney is standing at the threshold of the door and Officer B.A. immediately grabs Mr. Tenney by the jacket and pushes him back. Mr. Tenney backs up and raises his hands in a gesture of surrender. Officer B.A. holds Mr. Tenney's jacket by one hand, turns away to talk to another man and at that point, Tenney's co-defendant, Darrell Youngers puts his arm on the arm B.A. is using to grasp Tenney. Tenney pulls away from the grasp in a non-violent manner and he and Youngers retreat from Officer B.A.

After this incident, Tenney, Youngers and B.A. all leave the frame of the camera at around the 7 minute, 53 second mark. About 15 seconds later, B.A. walks back into frame toward the door with a demonstrator next to him. The demonstrator has his hand on B.A.'s shoulder. B.A. talks to the man and then Mr. Tenney walks into frame and gently pulls the demonstrator away from B.A., seemingly in an effort to diffuse any potential conflict between the two. This occurs at the 8 minute, 18 second mark. It should be noted that this is the exact same type of behavior which the government attributed to Mr. Tenney's co-defendant Darrell Youngers as mitigation material. ECF No. 55, pg. 19.  Mr. Tenney is actively attempting to keep peace between a demonstrator and a Capitol Police Officer. Mr. Tenney should receive the same consideration as Mr. Youngers, who was sentenced to probation.

The rotunda footage begins on a second video and the time starts over. As

other demonstrators begin to attack, shove, and pull Officer B.A. to the ground, Mr. Tenney is not nearby. He is near the doors and at the 15 second mark of the second Rotunda Video, he presses to the door and pulls a demonstrator into the rotunda. It is clear that this demonstrator is struggling with the effects of either tear gas, pepper spray or some other injury to his face. It is clear that Mr. Tenney is pulling him inside, away from the crowd to help him.

    Mr. Tenney then walks over to where Officer B.A. is on the ground with another officer helping him. Mr. Tenney looks at the scene and then backs away. After Officer B.A. is back on his feet, Mr. Tenney walks over to him and at the edge of the frame, can be seen talking with Officer B.A. It was not a threatening conversation and there are no physical gestures to indicate threatening behavior. Eventually Officer B.A. walks away from Mr. Tenney, turning his back to him, indicating that he did not perceive Mr. Tenney to be a threat. This occurs at the 52 second mark.

    Mr. Tenney agrees that he moved toward Officer B.A. and that Mr. Youngers held him back, but it is important to note the context of this event. Mr. Tenney was not present for the situation immediately prior to Mr. Youngers holding him back, when another officer told everyone to back away from B.A. a few moments after Mr. Youngers initially holds Mr. Tenney back, Mr. Tenney approaches B.A. and they talk as B.A. walks past Mr. Tenney and turns his back to him. This proves that when Mr. Tenney was being held back, he did not intend to engage in any physical altercation or threatening behavior towards Officer B.A. The fact that Officer B.A.

turns his back to Mr. Tenney further indicates that he did not see Tenney as a threat.

It is clear from the totality of the interactions between Mr. Tenney and Officer B.A. that Mr. Tenney's actions did not cause physical harm or threaten physical harm. It is clear from the video evidence that Mr. Tenney was attempting to open a door to the rotunda where people were violently pressed against a door with two shattered windows, engulfed in tear gas. During this effort, he had incidental physical contact with Officer B.A. and exchanged words with him.

Based on the government's notes from their interview with Officer B.A., he did not claim any physical injury or threat and could only recall Mr. Tenney possibly saying something to the effect of, "this is our house," and "we're on your side." This is consistent with the video footage of Mr. Tenney speaking to Officer B.A. where it does not appear that Officer B.A. feels threatened. If anything, it looks as though Mr. Tenney is trying to diffuse the situation.

*Officer J.G.*

Mr. Tenney's interaction with J.G. begins when Mr. Tenney opens first opens the rotunda door to allow people into the building. Officer J.G. pulls Mr. Tenney away from the door and wedges himself into the door. Mr. Tenney then presses against the door, side by side with J.G. He and J.G. then begin talking and a man comes into the building from the crowd. J.G. speaks to the man and allows him past and then walks away.

In his interviews with the government, J.G. does not allege any threats or physical harm from Mr. Tenney. The video evidence tends to support the position that Mr. Tenney was concerned with allowing people in through the doors to get away from the press and violence of the crowd outside. This is evidenced by the entry of a man, allowed in by Mr. Tenney, who appears to be in distress. J.G. speaks briefly with the man and then allows him to walk into the building. The verbal interaction between Mr. Tenney and J.G. appear to be in regards to Mr. Tenney's position that people should be allowed in to get out of harm's way.

Comparing the Actions of Tenney and Youngers

As the government stated in its memo regarding co-defendant Youngers, a fair sentence should take into consideration mitigating factors such as, 1) how the defendant entered the building; 2) whether the defendant encouraged violence; 3) whether the defendant encouraged property destruction: 4) defendant's reaction to acts of violence or destruction; 5) whether the defendant destroyed evidence; 6) the length of the defendant's time inside of the building and exactly where the defendant travelled; 7) the defendant's statements in person or on social media; 8) whether the defendant cooperated with, or ignored commands from police officers; 9) whether the defendant demonstrated sincere remorse or contrition. ECF 55, pg. 16.

1) Mr. Tenney and Mr. Youngers entered the Capitol Building at the same time and in the same manner; 2) Like Mr. Youngers, Mr. Tenney was not part of the

mob chasing officers, demanding to know the locations of law makers or inciting violence in any way; 3) There is no evidence that Mr. Tenney encouraged property destruction; 4) Like Mr. Youngers, Mr. Tenney actively separated a demonstrator from Officer B.A.; 5) Mr. Tenney did not destroy evidence; 6) Mr. Tenney and Mr. Youngers spent the same amount of time in the building and travelled through the same areas; 7) Mr. Tenney admits he was involved in discussions on social media prior to January 6 but after his arrest became disillusioned with his previous political stances; 8) Though Mr. Tenney was clearly at odds with Capitol Police Officers at times, he often backed off when instructed and left the building after only 13 minutes; 9) Importantly, Mr. Tenney is profoundly remorseful as is evidenced by his written statement attached to this document.

     Mr. Tenney acknowledges that his actions were not identical to those of Mr. Youngers and the treatment of their cases by the government has already taken the disparity into account. Unlike Mr. Youngers, Mr. Tenney is now a convicted felon, a mark he will carry for the rest of his life. He will travel to Washington D.C. to appear in person before this Honorable Court for sentencing rather than appear by video. Instead of a few months of incarceration, he faces years.

     The actions of Mr. Youngers and Mr. Tenney are not so disparate as to justify a probationary sentence (with a recommendation of 30 days by the government) for Mr. Youngers and 3 to 4 years or more for Mr. Tenney. They were together for the entire time, entering and exiting the Capitol together. Mr. Tenney had more interactions with Capitol Officers but did not physically harm them or threaten to

harm them. His interactions with J.G. lasted less than 30 seconds and did not result in physical harm or threats of harm. His interactions with B.A., are more protracted in general, lasting about 2 minutes 30 seconds. However, the direct interactions between the two, whether physical or verbal, only last roughly 30 seconds and do not result in physical harm or threat of physical harm. Mr. Tenney did not participate in any other actions that Mr. Youngers was not also a part of.

Conclusion

George Tenney is trying to get his life back in order, working long hours to provide for his family. He has fully moved on from the false and incendiary rhetoric that led to January 6. He realizes now that he and the others in the Capitol that day were merely pawns for ill-intentioned politicians and far-right media personalities. There is no part of him that ever wants to participate in any destructive behavior again. His only focus now is running his small take-out restaurant in order to provide for his children.

Mr. Tenney should not be punished in the same manner as people who were hitting police officers, pulling them to the ground, and chasing them through the Capitol. He was not trying to find law makers. He did not want to harm police officers and he did not threaten to do so. At the time, he believed that the rioters and police should be working together to protect the country. He realizes now that he was on the wrong side of history.

Therefore, Mr. Tenney respectfully asks this Honorable Court to consider a

sentence below the guideline range, whether it be 41 – 51 months or 21 – 27 months. A prison sentence for Mr. Tenney is not necessary to reflect the seriousness of his conduct as he has already been thoroughly punished with a felony conviction and the loss of a good job, damaging his ability to provide for his family. Furthermore, a prison sentence would create an unduly disproportionate sentence to that of his co-defendant, who was sentenced to probation for a misdemeanor.

    Mr. Tenney is profoundly sorry for what he has done and has already incurred massive consequences. He asks this Honorable Court for a chance to continue to provide for his family and help to raise his children.

Respectfully submitted,

*s/ Charles W. Cochran*
Charles W. Cochran
Assistant Federal Public Defender
145 King Street, Suite 325
Charleston, South Carolina
(843) 727-4148

November 27, 2022