**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-640 (TFH)** |
| **GEORGE AMOS TENNEY III,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM FOR DEFENDANT GEORGE AMOS TENNEY III

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence George Tenney to 48 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment for each count of conviction.

## I.      INTRODUCTION

The defendant, George Tenney, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than $2.8 million in losses.[1]

Before January 6, Tenney was aware of plans to "siege" the Capitol.   When he joined the

---

[1]  As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20.   That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.   Tenney's plea agreement used the government's previous estimate of the losses.

crowd that breached the building on January 6, he did so with clear understanding of what his conduct entailed.   Once inside the building, Tenney played a key role in exacerbating the attack. He forced open the Rotunda Doors for the first time, allowing approximately 48 rioters to enter – rioters who then fanned out throughout the Capitol, destroying property and assaulting police and threatening Members of Congress, their staff, and other persons lawfully inside the Capitol that day.   Indeed, the Rotunda Doors became one of two major entry points for rioters that day – in no small part because of Tenney's actions.   Along the way, Tenney pushed, shoved, and grasped at least two Capitol Police officers and one employee of the Sergeant at Arms.

The government recommends that the Court sentence Tenney to 48 months' incarceration, which is within the advisory Guidelines' range of 41-51 months, which the government submits is the correct Guidelines calculation. A 48-month sentence reflects the gravity of Tenney's conduct, which allowed dozens of rioters to enter the building and involved physical confrontations with law enforcement, all in service of an aspiration to disrupt the peaceful transfer of power.

## II.        FACTUAL BACKGROUND

### A.        The January 6, 2021 Attack on the Capitol

On January 6, 2021, thousands of rioters, Tenney among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions

were illegal and contributed, directly or indirectly, to the violence and destruction that day.   *See United States v. Mazzocco*, 1:21-cr-54 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

The PSR and the Statement of Offense describe the riot that took place at the U.S. Capitol on January 6, 2021, interrupting the joint session of Congress to certify the electoral vote count for the 2020 presidential election.   *See* Statement of Offense ¶¶ 2-9; PSR ¶¶ 18-24.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol

Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.8 million dollars.

**B.     Tenney's Role in the January 6, 2021 Attack on the Capitol**

*Preparation for January 6*

In late 2020, Tenney, a resident of South Carolina, was an administrator for a political Facebook page, the PowerHouse Patriot.   Tenney's friend, Individual-1, ran PowerHouse Patriot. Tenney made plans to travel with Individual-1 to Washington, D.C.   Before January 6, Tenney exchanged digital messages with Individual-1 and others regarding his plans.   These messages show that Tenney sought to join extremist groups, including the Proud Boys, and was aware that plans to "siege" the Capitol were underfoot.

After the 2020 presidential election, Tenney exchanged numerous messages and reports making various claims of election fraud that had supposedly cost Donald Trump the presidency. On November 27, 2020, referring to the election, Tenney messaged Individual-1, "If we [don't] win this, THERE WILL BE A REVOLUTION! No other option in my opinion."   On December 14, Tenney asked Individual-1, "Where and how do I get involved or a part of one of these patriot revolution groups? Like proud boys, or any of the other American Patriot Militias??"

He also exchanged messages with Individual-1 claiming that the "dual slate" of "Electoral Votes sent in yesterday by GOP Legislatures" were legitimate.   When Individual-1 said, "I know they stole this election, I think they are gonna get away with it like the way they get away with everything," Tenney responded with a post from Trump attorney Jenna Ellis describing how the election results could change on January 6.   He also exchanged text messages reporting that Democrats were being arrested for election fraud and suggesting that swing states would be sending in electoral votes for Trump.

The next day, Tenney wrote to another Facebook contact (Individual-2), "We need the

hailmary!  No doubt.  But I'm keeping hope. And when that doesn't work.  WE HAVE TO MARCH!!!"

After Donald Trump announced plans for a "wild" protest in Washington D.C. on January 6, Tenney began to make plans with Individual-1 to attend.   On December 22, he wrote, "What's up in DC??? Rally?? Trump??? What's going on? I wanna be involved!!"   Tenney and Individual-1 exchanged several messages coordinating their

Meanwhile, on December 27, Tenney wrote to Individual-2 on Facebook: "I heard over 500k armed militia patriots will be in DC by the 4th. And will start early waiting for rest of us on the 6th. 😎 They already predict over million people will be in DC the 6th."

The next day, he wrote a Facebook message to Individual-1 suggesting that he was aware that January 6 could turn violent:

> We need to go over some game plans for the 6th too. Like some just in case scenarios. For coming , during, and leaving. I also think I'm going to bring my AR and Pistols. The more I look into everything going on, and what could happen in DC, it could get nasty. Probably not, but could. You ok with all that?? We'll chat soon.

The government is not aware of evidence indicating that Tenney ultimately brought firearms to the U.S. Capitol.

Also on December 28, in a message to Individual-2, Tenney expressed awareness of plans to storm the Capitol:

> We need to talk about trip to DC. Y'all still going? I've been digging deep. Wanting to know exactly the what's when'd how's and where's. Why are we there? What are we doing? ***It's starting to look like we may siege the capital building and congress if the electoral votes dont go right***. There's a bunch going around, figured we should talk bout it. The people I'm going, we are forming plans for every

scenario. What you think?

(Emphasis added).

The following day, Tenney also reported talk of "siege" and "domestic war" – which "patriots and Americans" could stop by being the "end all force of change," further portending the violence that would take place at the Capitol:

> I've been watching these pod cast things from this guy. He says Pence is a traitor and will betray the US on the 6th. Then flee the country. Biden will go in. Then long story short country goes into this schedule of domestic war and siege. Bloodshed and so on. . . They are expecting patriots and Americans to be the end all force of change I'm leaving soo much out and can't remember shit. But it was a lot. You wanna see it?

On January 4, Tenney encouraged a friend to join him on the trip, describing it as "something I believe will save our country."   On January 5, Tenney again asked Individual-1 if he had "heard or seen anything going on today in DC? Like proud boys / militia groups etc."

### *Arrival in D.C. and Breach of the Capitol*

In the early-morning hours of January 6, Tenney and Individual-1 drove to Washington, D.C., where Individual-1 had booked accommodation at the Hampton Inn.   After arriving, Tenney and Individual-1 went to the rally in support of President Trump.   They met and befriended Tenney's co-defendant, Darrell Youngers, a former Marine who had traveled to Washington from Texas.   After the rally, the group marched to the U.S. Capitol.   They stopped just outside the Capitol Grounds, near roadblocks labeled "STOP."   Filming a video, Youngers reported on the status of the certification, noting that objections to Arizona's vote had been lodged.   They also commented on the indications of unrest that they were seeing: a noise that sounded like a "cannon" going off, police, in Youngers' words, "hauling ass," and an announcement they heard over a police radio calling for officers who were protecting the windows to go to the West Side of the

Capitol.   Youngers commented, "something's going on," and asked the others, "you guys hear that on the radio, fire in the hole?"   The group also noticed what they thought were SWAT teams approaching the Capitol.

Tenney and Youngers advanced forward on to Capitol Grounds, where it soon became apparent what was happening.   Youngers filmed a video where he narrated, "people have just stormed the front of the Capitol building, through tear gas…people aren't supposed to be up there, but they're there."

Tenney and Youngers continued to advance toward the building.   When they got closer, they saw that the staircase leading up toward an entrance was clogged with rioters so they scaled a wall to reach the Upper West Terrace instead.   On the Upper West Terrace, Youngers filmed a confrontation between police and rioters outside the Parliamentarian Door.   In the video, rioters can be seen throwing objects at the police.   In what would soon become a pattern, Youngers hung back while Tenney ran ahead and joined a group of rioters verbally confronting the police, jabbing

his finger in the air, as shown in Image 1, below (the yellow arrow identifies Tenney).



Image 1

Youngers and Tenney then advanced to the Senate Wing Doors and entered the U.S.

Capitol Building at approximately 2:19 p.m., less than ten minutes after the initial breach.    Alarms

blared, and broken glass was visible on the floor. *See* Image 2.



Image 2

Once inside the area, Youngers filmed a video and turned the camera on himself and Tenney as he rejoiced, "We are inside the Capitol Building.   It has been overrun.   The Capitol Building has literally been broken into."   He yelled, "this is what a revolution motherfucking looks like!"   *See* Image 3, below.



Image 3

Tenney also filmed a video with his cell phone.   Tenney and Youngers walked down a

hallway and climbed a set of stairs.   They passed through the Rotunda.   Again, Tenney moved ahead of Youngers.   He entered the East Foyer, a wide hallway between the Rotunda and the Rotunda Doors, which led to the East Front outside the Capitol.   The Rotunda Doors had not yet been breached and were being defended by a small number of officers who were outside the doors, trying to hold off a large crowd of rioters.

***The East Front and the Rotunda Doors***

In part because of Tenney's actions, one of the main points of entry for rioters on January 6, 2021 was through a set of ornate double doors at the top of the Central East Steps.   These doors have been referred to as the Rotunda Doors. The Rotunda Doors are often regarded as the main door into the Capitol Building. In Images 4 and 5, below, the Rotunda Doors are circled in red.



*Image 4 – Screenshot from https://youtu.be/CqBB3Mt06XA*



*Image 5: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

On January 6, 2021, the outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" United States Capitol Police (USCP) officers were stationed nearby as well as patrolling through the grounds. In Image 5, the barricades on the East Front are indicated with dotted lines.   At about 1:58 p.m., individuals in the northeast corner began to tear down the

barricades and move into the East Plaza.   *See* Image 6, below.



Image 6

Shortly thereafter, rioters began pushing against police and tearing down barriers throughout the perimeter. The rioters pressed forward, through the East Plaza.   *See* Image 7, below.



Image 7

The USCP established a temporary police line at the base of the East Central steps but were soon overrun.   At about 2:06 p.m., rioters flooded up the steps.   *See* Image 8, below.



Image 8

The USCP officers retreated to the Rotunda Doors and were surrounded. Rioters attacked them with sticks, fists, flag poles, and tear gas before they escaped the area.   *See* Image 9, below.



Image 9

Rioters outside the Rotunda Door attacked the police and tried to break in, smashing the windows in the process.   There was enough space between rioters, officers, and the doors, however, for Tenney to open them from the inside – which, as described below, he did, at about 2:25 p.m.

14

***Tenney Causes the First Breach of the Rotunda Doors and Shoves an Employee of the House
Sergeant at Arms***

Exhibit 1 to this memorandum is a clip from U.S. Capitol Police surveillance video

showing Tenney's conduct at the Rotunda Doors.   As seen in the video, Tenney approached the

closed Rotunda Doors, lowered his shoulder, and unsuccessfully tried to push one of the doors

open.   He then tried the other door.   After about 20 seconds, he tried again, and succeeded in

opening the door to the left.[2]   *See* Image 10, below.



Image 10

A police officer outside tried to push them closed, and Tenney resisted, pushing against the

door to try to keep it open and trying to wedge his body in the doorframe.   Employee J.G. of the

House Sergeant at Arms entered the East Foyer from the direction of the Rotunda and ran toward

Tenney. He pulled Tenney away and tried to close the door. Youngers followed behind J.G., and

---

[2] The door Tenney opened was an emergency door with a red sign on a stand in front of it that
read: "EMERGENCY EXIT ONLY PUSH UNTIL ALARM SOUNDS (3 SECONDS) DOOR
WILL UNLOCK IN 15 SECONDS."

approached when he saw Tenney and J.G. struggling.

J.G. faced outside as he tried to push rioters away and close the doors.   Tenney ran back toward the door and grabbed J.G. from behind, pushing him toward the doorframe.   J.G.'s head appeared to make contact with the doorframe because of Tenney's push.   *See* Image 11, below.



Image 11

Image 12, below, is a close-up of the same motion:



16

Image 12

J.G. turned to face Tenney, who pushed against J.G.'s chest. See Image 13, below.



Image 13

Image 14, below, is a closer view during the same interaction:



Image 14

Tenney and J.G. had a heated conversation, with Tenney jabbing his finger at J.G.'s chest.

Two other rioters joined Tenney, confronting and surrounding J.G.   *See* Image 15, below.

17



Image 15

In an interview, J.G. told the FBI that he recalled a heated exchange, with Tenney saying something along the lines of, "You're not going to stop us" and "there's [x number] of us." Youngers picked up the red sign and moved it away from the center of the doors.

Next, a rioter from outside the doors forced his way inside and pushed J.G. back, away from the doors. Tenney continued to stand in the doorway.   *See* Image 16, below.



Image 16

Tenney then reached forward, and locked arms with Capitol Police officer B.A. as Officer B.A. entered the East Foyer from outside.   *See* Images 17 and 18, below.

18



Image 17



Image 18

Tenney put his hand on Officer B.A.'s chest as the two separated, and then grabbed

Officer B.A.'s arm.   See Image 19, below.

19



Image 19

While Officer B.A. was occupied with Tenney, another rioter was able to breach the building behind him.

Youngers moved in and touched Officer B.A.'s arm too, as if to move it away from Tenney.   In Image 20, below, from Capitol Police security footage taken from a different angle, a yellow arrow points to Tenney, and a red arrow points to Officer B.A.



Image 20

20

Officer B.A. turned toward Tenney, and Tenney and Youngers shuffled backward toward the Rotunda, as if retreating.   Officer B.A. followed them.   Officer B.A. adjusted his belt and turned around to return to fight the rioters' continuing effort to breach the Rotunda Doors.   Tenney yelled "Stand up, patriots, stand up!"   *See* Image 21, below.



Image 21

Less than 20 seconds after leaving the East Foyer, Tenney also returned to the area, where he continued to try to facilitate rioters' efforts to invade the Capitol.   Officer B.A. was standing by the door, trying to keep rioters out.   Tenney walked up to confront Officer Adams again, yelling "we are one of you!"   *See* Image 22, below.

21



Image 22

When Tenney moved in to interfere with Officer B.A., rioters were able to break through the entrance.   See Image 23, below.



Image 23



Image 24

They began to pour inside through the one open door.   Tenney moved back to make space for them to enter, yelled, "come on, Americans!" and helped the rioters move forward into the building, patting them on the back, as seen in Image 25, below.   In Exhibit 2, a clip from the open-source video depicted in Images 21-22, Tenney can be heard yelling, "Stand up, Patriots, stand up!" "we are one of you!" and "come on, Americans!"



Image 25

23

Tenney did not treat all individuals entering the building equally, however.   When Capitol Police Officer J.M.G. entered, Tenney shoved him to the side.   See Image 26, below.



Image 26

Officer B.A. remained by the door.   His radio cord got twisted around a nearby bench, and Youngers untangled it and pushed the bench out of the way. Tenney went up to the right-hand-side door, which was still closed, and tried to push it open it – which would have allowed even more rioters to enter.   Meanwhile, another rioter grabbed Officer B.A. from behind and threw him to the ground.   Another officer came to Officer B.A.'s aid.   Tenney then approached Officer B.A., but Youngers and another individual tried to keep Tenney away as the assisting officer helped Officer B.A. to his feet.   In Image 27, below, a yellow arrow points to Tenney, a red arrow to the officer assisting Officer B.A., and a blue arrow points to Youngers.



Image 27

Youngers continued to try to keep Tenney away.    See Image 28, below.



Image 28

A few more officers arrived on the scene and tried to close the doors.   One officer turned

around and hurled himself backward through the door to push the crowd back so that the door could be closed.   Tenney then came up and positioned himself in the door jamb so that the door could not be closed.   *See* Image 29, below.



Image 29

An officer then pushed Tenney back, and another rioter pulled him away from the police. At about 2:28 p.m., officers finally succeeded in closing the door.   By that point, approximately 48 rioters had entered, including several rioters who went on to threaten and assault officers inside the building.

Tenney moved toward the officers and appeared to verbally confront them.   *See* Image 30, below.



Image 30

Youngers pulled Tenney away from the confrontation and led him out of the East Foyer and toward the Rotunda.   An officer ordered them away from the doors and told them to go sit down in a hallway.   They retreated through the Rotunda and retraced their steps to the Senate Wing Doors.   There, at about 2:32 p.m., approximately 13 minutes after they had entered, Tenney and Youngers left the Capitol Building by climbing out through a window near the Senate Wing Door.   They returned to the area of the Upper West Terrace near the scaffolding in place for the inauguration, and then decided that the tear gas in the air was affecting them too strongly and decided to leave.

### *Tenney's Communications After Leaving the Capitol*

That afternoon, Tenney sent a message to his father: "We took the capital!!     It's happening!!!"   His father responded that he had heard there was tear gas.   Tenney replied, "Yeah.

It's bad.    I'll call you to talk.    Don't want to text it."   Tenney also wrote, ""I was in the first crowd.    It turned bad quick.    The msm [mainstream media] and[]news is LYING!!!" At 4:02 p.m., Tenney wrote, "Pence betrayed us."

That evening, back at the hotel, Tenney, Youngers, and another individual who had participated in the breach donned full face coverings and participated in an interview with Individual-1 about what had happened that day.   Tenney is on the right, and Youngers is on the left.



Image 31

In messages sent after January 6, Tenney warned of civil war and spread conspiracy theories and false information about the January 6 attack.   He claimed to have met with "very prominent people for some very major groups" in Washington, D.C., including Oath Keepers. Reporting the meeting to a friend, he wrote, in a Facebook message, "It's real…We are in war." He also spread various conspiracy theories.   For example, on January 9, 2021, he claimed that the rioters included an undercover military for Trump that was present to obtain documents and computers. On January 10, in a Facebook message, he explained, "[t]here was a military special

28

ops going on in the capitol while 'patriots' were in there. They took 17 computers and dozens of documents. Pelosi went above her head and tried an army coup on Trump. It's bad. It's all going down. We are at war!"  He said that "Americans need to be ready to fight."  On January 11, he said, in a Facebook message, "We will not go down!  I saw what America was ready for last week!"

In a January 10 message, he told a contact, "I've been talking with the Oath Takers (marines) I met in DC[]all weekend.  I have dozen other messages and video.  We are at war. Air space cleared."  He claimed, "Trump declared insurrection last night at midnight.   The flag on the White House was removed.   6000 troops in DC right now. Martial law and power grid loss is a good possibility."   He told the contact that "Trump will communicate with us through Pompeo using the emergency transmi[ss]ion alert."

To another Facebook contact, on January 12, Tenney wrote, "I may or may not have connection with The Oath Keepers, III Percenters, and Proud Boys. All ex Marines and military. I could talk for hours about who and what Antifa/BLM is and how these Patriot groups go from city to city to fight Antifa and protect the people. Antifa is controlled and funded by the FBI and CIA." In another message, he suggested he was working with militia groups: "But I may or may not be helping some groups during these times right now and I pretty much cannot get off my phone and communicating with certain people in certain places…"   He warned a contact to prepare for martial law and to stockpile survival supplies.

Later that month, on January 24, Tenney noted, "The election was stolen, everyone knows it in politics and military."   In the same post, he claimed to have moved on from "that Q mess" – i.e., Q-Anon – although he "want[ed] to believe" it was true.

In addition, Tenney exchanged messages with William Robert Norwood, who has also been charged in connection with his conduct on January 6.   On January 18, 2021, Tenney asked Norwood (via Facebook), "What's going on at Capitol?"   Norwood replied that he was watching a live feed that showed smoke coming from the Capitol, although it may be a fire at homeless encampment.   Norwood said, "At first, all I saw was people running and smoke lol" and "I was like…OH SHIT!! HERE WE GO!"   Tenney replied, "Yeah, THAT WOULD'VE BEEN AWESOME !!!"

In addition, Tenney exchanged messages with Individual-1, in which they discussed how to shield Tenney from investigations into his actions on January 6.   On January 8, Tenney wrote to Individual-1, "You gotta take that video down for now.   My work just called investigating." He told Individual-1 that someone had seen one of Individual-1's videos from January 6 that featured Tenney and informed his employer.   He further explained, "They are trying to link it to the one in the mask" (the interview from Tenney's hotel the night of the 6th).   The next day, Individual-1 reported to Tenney that Norwood was on the news, but was not worried because "all they can do is tell him never to return to D.C."   On January 10, Individual-1 asked, "If they call what are you gonna tell them? So I know what to tell them if they call me."   Tenney replied, "I'm gonna say I wasn't in and I'm not talking." They discussed the FBI's investigation.

### Statements to the FBI

On February 9, 2021, the FBI visited Tenney's residence and interviewed him.   Tenney admitted he went inside the Capitol Building and described what he was wearing that day.   He acknowledged his affiliation with the PowerHouse Patriot Facebook page and admitted that video content had been removed from that page in the days following January 6.   Tenney

otherwise minimized his conduct and provided inaccurate information.   He said he entered approximately 45 minutes to one hour after the initial breach and saw no barricades or police presence until he got inside (as described above, video evidence shows Tenney confronting police outside the Parliamentarian Door before he entered the building).   Tenney said that he was only in the building for three or four minutes before he realized something bad was happening, prompting him to leave.   He also said that a SWAT-uniformed officer told him that "we need people like you to help get everyone out."   Tenney claimed that he told people to stop damaging things and helped lift fallen officers back to their feet.   He declined to give the FBI the names of anyone who would corroborate his story.

On January 31, 2022, several months after his indictment, Tenney participated in a proffer session with FBI, where he was shown video of his conduct.   He claimed he had attempted to open the Rotunda Doors only because he was concerned that rioters outside the door were getting injured.

## III.    THE CHARGES AND PLEA AGREEMENT

Tenney and Darrell Youngers were both arrested and charged by complaint on June 28, 2021.   On October 22, 2021, a grand jury returned an indictment against Tenney and Youngers. The indictment charged both defendants with four misdemeanors in connection with their entry into the Capitol (Counts Four, Five, Seven, and Nine).   Tenney was also charged with civil disorder, in violation of 18 U.S.C. § 231(a)(3) (Count One), obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2) (Count Two), Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Count Three) (in connection with his confrontation at the Rotunda Doors with J.G. of the House Sergeant at Arms), and an engaging in physical

violence in a restricted building or grounds and the Capitol Grounds or Buildings, in violation of 18 U.S.C. § 1752(a)(4) and 40 U.S.C. § 5104(e)(2)(F) (Count Eight).

On March 30, 2022, Youngers pled guilty to Count Nine of the indictment (parading, demonstrating, or picketing in a Capitol Building) and, on September 8, was sentenced to 36 months of probation and a $1000 fine.   Tenney pled guilty to Counts One and Two (civil disorder and obstruction of an official proceeding) on June 30, 2022, pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

On Count One, the violation of 18 U.S.C. § 231(a)(3) (civil disorder), Tenney faces a maximum sentence of five years' imprisonment, a fine of $250,000, and three years' supervised release.   On Count Two, the violation of 18 U.S.C. § 1512(c)(2) (obstruction of an official proceeding), Tenney faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

The Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

## A.  The Guidelines Calculation

The government calculates defendant Tenney's Guidelines range as set forth below.   In the plea agreement, Tenney agrees to these calculations, except that he is permitted to oppose the imposition of the +8 enhancement under U.S.S.G. § 2J1.2(b)(1)(B) to the guideline for Count Two, the 1512(c)(2) count, for threatening or causing injury or property damage.   Probation agrees with the government that the court should apply the enhancement and agrees that the Total Offense Level, after adjusting for acceptance of responsibility, is 22.

The draft PSR does not include a separate Guidelines analysis for both Counts—Counts One and Two—to which the defendant pleaded guilty. *See* PSR ¶¶ 48-64.[3]   It notes the parties' analysis for each count (PSR ¶¶ 9-11), which is as follows:

Count One: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Physical Contact | +3 |
| | **Total** | **13** |

Count Two: 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[4] | +3 |

---

[3] Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3.

[4] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Tenney admitted that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses. As described herein, law enforcement officials from all over the D.C. metropolitan area responded to assist USCP and Metropolitan Police Department officers in

| | | | |
|---|---|---|---|
| *U.S.S.G. § 2J1.2(b)(1)(B)* | *Threat or Physical Injury to Person or Property (left open to dispute)* | | *+8* |
| | | **Total** | **25** |

| | | |
|---|---|---|
| **Combined Offense Level** | **25** | |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | <u>-3</u> |
| | | |
| **Total Adjusted Offense Level:** | | **22** |

The draft PSR finds that Counts One and Two group because "one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the count(s)."   PSR ¶ 52 (citing U.S.S.G. §3D1.2(c)).[5]

If the Court does <u>not</u> apply the eight-point enhancement under U.S.S.G. § 2J1.2(b)(1)(B), the guidelines calculation would be as follows:

<u>Count One: 18 U.S.C. § 231(a)(3)</u>

| | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.4 | Base Offense Level | | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Physical Contact | | <u>+3</u> |
| | | **Total** | **13** |

<u>Count Two: 18 U.S.C. § 1512(c)(2)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[6] | +3 |

protecting the Capitol from the rioters.

[5] The parties' plea agreement provides that Counts One and Two do not group, but it reaches the same conclusion regarding the offense level (22, if the +8 enhancement applies) regardless.

[6] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Tenney admitted that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses. As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

                                                                         **Total        17**

Under that scenario, where the Court does not apply the enhancement under U.S.S.G.

§ 2J1.2(b)(1)(B), the conduct underlying the Section 231 offense would not contribute to an

increase in the Offense Level of the Section 1512(c)(2) conviction under U.S.S.G. § 3D1.2(c).

Consequently, Counts One and Two would not group, as the parties stipulated in the plea

agreement.   Under U.S.S.G. § 3D1.4(a), because the two Offense Levels would be only four levels

apart (13 and 17), they would each be counted as one unit, resulting in a total of two units which,

under § 3D1.4, requires a two-level increase to the highest offense level, for a total offense level

of 19, before any reduction for acceptance of responsibility under U.S.S.G. § 3E1.1.   After the

three-point reduction, then, if the Court declines to apply the eight-point enhancement for

threatening or causing injury or property damage, the total offense level will be 16.

Tenney is in Criminal History Category I.   His guidelines range is therefore 41 to 51

months (at guidelines level 22) or 21 to 27 months (at guidelines level 16).   The parties agree,

pursuant to U.S.S.G. § 5E1.2, that the Guidelines fine range is $15,000-$150,000 at level 22 and

$10,000-$95,000 at level 16.   *See* Plea Agreement at ¶¶ 5(C).

### B. The Eight-Point Enhancement for Causing or Threatening Injury or Property Damage to Obstruct the Administration of Justice Should Apply.

The Court should calculate Tenney's offense level for Count Three as 25, which includes

an eight-point enhancement for causing or threatening to cause injury or property damage in order

to obstruct the administration of justice under U.S.S.G. § 2J1.2(b)(1)(B).   Here, Tenney

obstructed the electoral vote by physically confronting three officers and forcing open the Rotunda

Doors, allowing many more rioters to breach the Capitol.   His conduct triggers the enhancement

in § 2J1.2(b)(1)(B) because the term "administration of justice" as used in the Guidelines applies to the certification of the Electoral College vote.

> **1. The certification of the Electoral College vote involved the administration of justice as defined broadly in the Guidelines.**

Section 2J1.2, entitled "Obstruction of Justice," applies to a variety of obstruction offenses, including all offenses under § 1512 and under 11 other statutes found in Chapter 73 of Title 18. *See* U.S.S.G. § 2J1.2 cmt.; U.S.S.G. Appendix A.   It provides for an eight-level increase if the offense involved causing or threatening injury to a person or damage to property "in order to obstruct the administration of justice."   U.S.S.G. § 2J1.2(b)(1)(B).   It also provides for a three-level increase "if the offense resulted in substantial interference with the administration of justice." U.S.S.G. § 2J1.2(b)(2).   In Tenney's plea agreement, he agreed to the three-point enhancement under U.S.S.G. § 2J1.2(b)(2) but retained the right to contest the eight-point enhancement under U.S.S.G. § 2J1.2(b)(1)(B).

Section 2J1.2's text, purpose, and commentary all support the conclusion that conduct that obstructs Congress's certification of the Electoral College vote interferes with the "administration of justice" for purposes of the guideline.   Administration of justice, in its broadest sense, refers to the proper administration of law by all three branches of government.   Black's Law Dictionary defines "justice" to include "[t]he fair and proper administration of laws," and it defines "obstruction of justice" as "[i]nterference with the orderly administration of law and justice." Black's Law Dictionary (11th ed. 2019); *see* Ballentine's Law Dictionary 696 (3d ed. 1969) (defining justice to include "exact conformity to some obligatory law").   When defining "contempt" to include "[c]onduct that defies the authority or dignity of a court *or legislature*," Black's Law Dictionary observes that "such conduct interferes with the administration of justice."

Black's Law Dictionary (11th ed. 2019) (emphasis added).   And courts have defined "administration of justice" to mean "the performance of acts or duties required by law," *Rosner v. United States*, 10 F.2d 675, 676 (2d Cir. 1926) (quotation omitted), or "the performance of acts required by law in the discharge of duties," *United States v. Partin*, 552 F.2d 621, 641 (5th Cir. 1977).

To be sure, the term "administration of justice" is more commonly used in a narrower sense to refer to "interference with the pendency of some sort of judicial proceedings." *In re Kendall*, 712 F.3d 814, 828 (3d Cir. 2013); *see In re McConnell*, 370 U.S. 230, 234, 236 (1962) (defining the term in the contempt context as relating to "the performance of judicial duty"); *United States v. Aguilar*, 515 U.S. 593 (1995) (stating that the "omnibus clause" of 18 U.S.C. § 1503, which criminalizes obstruction of the "due administration of justice," requires proof of "an intent to influence judicial or grand jury proceedings").   But there are compelling reasons for concluding that "administration of justice" bears its broader (albeit less common) meaning in U.S.S.G. § 2J1.2.

First, § 2J1.2's context and purpose support the broader reading of "administration of justice" in both (b)(2) and (b)(1)(B).  Section 2J1.2 applies to an array of obstruction statutes, including a number that do *not* involve the "administration of justice" in the narrow sense (i.e., relating to judicial or quasi-judicial proceedings).  *See* U.S.S.G. § 2J1.2 cmt. (listing covered statutes); U.S.S.G. Appendix A (statutory index).   Those offenses include concealing or destroying invoices or papers relating to imported merchandise, 18 U.S.C. §§ 551; obstructing an investigation under the Workforce Innovation and Opportunity Act, 18 U.S.C. § 665(c); obstruction of proceedings before departments, agencies, and committees, 18 U.S.C. § 1505; obstruction of enforcement of state gambling laws, 18 U.S.C. § 1511; obstruction of official

proceedings, 18 U.S.C. 1512; obstruction of a federal audit, 18 U.S.C. § 1516; destruction of documents in agency investigations, 18 U.S.C. § 1519; and interfering with the administration of the Internal Revenue Code, 26 U.S.C. § 7212.   Yet under a narrow interpretation of the guideline, the enhancements under §§ 2J1.2(b)(1)(B) and (b)(2) would not apply to those statutes.   That is good reason to reject such a reading.   *Cf. United States v. Castleman*, 572 U.S. 572 U.S. 157, 167 (2014) (rejecting a reading of 18 U.S.C. § 922(g)(9) that "would have rendered [it] inoperative in many States at the time of its enactment").

Section 2J1.2's background indicates that the Sentencing Commission intended the enhancements to reach the type of dangerous conduct at issue in this case.   The background notes that § 2J1.2 broadly covers crimes "of varying seriousness," including offenses that involve intercepting grand jury deliberations, interfering with an illegal gambling investigation, or obstructing "a civil or administrative proceeding," and that the underlying conduct may "range from a mere threat to an act of extreme violence."   U.S.S.G. § 2J1.2 cmt. Background.   Within that range, the enhancements "reflect the more serious forms of obstruction."   *Id.*   The Commission thus crafted the enhancements in § 2J1.2 to cover the most egregious *conduct* in the full knowledge that obstruction-of-justice offenses are not limited solely to interference with judicial proceedings.

Relatedly, limiting § 2J1.2(b)(1)(B)'s eight-level enhancement to obstruction of judicial proceedings would undermine the purpose of the Guidelines.   "A principal purpose of the Sentencing Guidelines is to promote uniformity in sentencing imposed by different federal courts for similar criminal conduct."   *Hughes v. United States*, 138 S. Ct. 1765, 1774 (2018).   The Guidelines therefore seek to achieve "a strong connection between the sentence imposed and the

offender's real conduct." *United States v. Booker*, 543 U.S. 220, 246 (2005).   The Sentencing Commission quite reasonably determined, for example, that "causing or threatening physical injury to a person, or property damage, in order to obstruct the administration of justice" is more serious than obstruction not involving such injury or threats and should be punished more severely. U.S.S.G. § 2J1.2(b)(1)(B).   And the seriousness of the threatening or injurious conduct does not depend on whether the obstructed proceeding is judicial, legislative, or executive.   There is no sound basis for assigning a significantly higher offense level to someone who violently interferes with a court proceeding than someone who violently interferes with a congressional proceeding. *See United States v. Rubenacker,* 21-cr-193 (BAH), May 26, 2022 Sentencing Hearing Tr. at 69 ("There is simply no indication in guideline Section 2J1.2 that the [specific offense characteristics] containing the phrase 'administration of justice' were meant to apply to only some of the statutes referenced to this guideline and not to apply to all of the cases involving obstruction of proceedings taking place outside of courts or grand juries; that simply doesn't make sense.")

This is especially true considering that subsections (b)(1)(B) and (b)(2) are not simply two factors among many but are the key sentencing factors in most obstruction cases.   The three other enhancements in § 2J1.2 have limited application.   Subsections (b)(1)(A) and (b)(1)(c) apply only to violations of § 1001 and § 1505 relating to sex or terrorism offenses.   And subsection (b)(3), a comparatively minor two-level increase, applies only where a document was destroyed or altered or the offense was "extensive in scope, planning, or preparation."   U.S.S.G. § 2J1.2(b)(3). Reading the enhancement in subsection (b)(1)(B) (or that in (b)(2)) as applying only to judicial or quasi-judicial proceedings would fail to distinguish between the seriousness of offenders' conduct

in a wide variety of obstruction offenses covered by § 2J1.2.   On the other hand, reading the term "administration of justice" more broadly eliminates this gap in the guideline.

Second, Section 2J1.2's commentary provides a broad definition of "administration of justice."   It defines "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; or *the unnecessary expenditure of substantial governmental or court resources*." U.S.S.G. § 2J1.2 cmt. n.1 (emphasis added). This definition includes interference not only with "court" resources, but also with any "governmental" resources, a term that includes congressional resources.    The Supreme Court has held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993). Because this commentary is consistent with the plain text of the Guideline, which uses the broad term "administration of justice," it is authoritative.

To be sure, the commentary defines only the term "substantial interference with the administration of justice," which serves as the basis for the three-point enhancement in U.S.S.G. § 2J1.2(b)(2) and does not specifically define the term "in order to obstruct the administration of justice," which serves as the basis for the eight-point enhancement in U.S.S.G. § 2J1.2(b)(1)(B). But the relevant term "administration of justice" is identical and should be given the same interpretation in both enhancements—one of which Tenney has agreed should apply.   The operative verbs "interfere[]" and "obstruct" carry the same meaning in this context.   And the adjective "substantial" in § 2J1.2(b) does not change the meaning of "administration of justice,"

especially since the commentary repeats the word, requiring "the unnecessary expenditure of *substantial* governmental . . . resources."   U.S.S.G. § 2J1.2 cmt. n.1 (emphasis added).   Thus, the term "in order to obstruct the administration of justice" in U.S.S.G. § 2J1.2(b)(1)(B) should be read to include obstructive conduct aimed at nonjudicial governmental activities.   A different conclusion would lead to the incongruous result of giving two different meanings to the term "administration of justice" within the same guideline.   *See Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning.").

Obstruction of the Electoral College certification vote on January 6, 2021 falls comfortably within the meaning of "administration of justice" as used in § 2J1.2 because it involved Congress's performance of duties required by law.   Specifically, Congress's certification of the Electoral College vote was an official proceeding required by both the Constitution and federal statutes. [7] *See* U.S. Const. art. II, § 1, cl. 3; 3 U.S.C. §§ 15-18.   Application of both subsections (b)(1)(B) and (b)(2) is therefore appropriate here.

---

[7] Chief Judge Howell has articulated a different basis on which to apply the enhancement to obstruction of the Electoral College certification.   *Rubenacker,* 21-cr-193 (BAH), Sentencing Hearing Tr. at 69.   She pointed out that Black's Law Dictionary defines "administration of justice" to include the "maintenance of right within a political community by means of the physical force of the state," Black's Law Dictionary (11th ed. 2019), and observed that the joint session of Congress used "'the physical force of the state' in the form of law enforcement officers located in and around the Capitol to secure the proceedings."   *Rubenacker,* Sentencing Tr. at 75.   This understanding of the guideline is arguably broader than the interpretation advanced by the government because it could apply to any proceeding (or event) at which there was a police presence, rather than being limited to proceedings involving the administration of the law.

## 2. Courts, including judges on this Court in January 6 cases, have correctly held that non-judicial proceedings can involve the administration of justice.

Other courts have appropriately applied the "administration of justice" enhancements in U.S.S.G. § 2J1.2 to efforts to obstruct a wide range of proceedings that were not limited to judicial or grand jury proceedings. *See United States v. Ali*, 864 F.3d 573, 574 (7th Cir. 2017) (upholding the application of § 2J1.2(b)(2) after law enforcement officials expended substantial resources to recover the defendant's children he kidnapped and transported internationally); *United States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 205-08 (D.N.J. 2009) (applying § 2J1.2(b)(2) after a defendant interfered with OSHA investigations into a workplace accident); *United States v. Weissman*, 22 F. Supp. 2d 187, 194-98 (S.D.N.Y. 1998) (applying § 2J1.2(b)(2) after a defendant withheld subpoenaed documents from a congressional subcommittee).

Several judges on this Court have applied § 2J1.2's "administration of justice" enhancements in cases arising from the Capitol breach on January 6, both in cases where the parties agreed to their application and where the application was contested. *See, e.g.*, *United States v. Wilson*, No. 21-cr-345 (Lamberth, J.); *United States v. Hodgkins*, No. 21-cr-188 (Moss, J.); *United States v. Fairlamb*, No. 21-cr-120 (Lamberth, J.); *United States v. Chansley*, No. 21-cr-003, (Lamberth, J.); *United States v. Matthew Miller*, No. 21-cr-075 (Moss, J.) (uncontested, but independently addressed by the Court); *United States v. Rubenacker*, No. 21-cr-193 (contested); *United States v. Guy Reffitt*, No. 21-cr-032 (Friedrich, J.) (contested); *United States v. Pruitt,* No. 21-cr-23 (Kelly, J.); *United States v. Robertson,* 21-cr-34 (Cooper, J.) (contested).

## 3. Judge McFadden's contrary conclusion in *Seefried* is unpersuasive.

One judge on this Court, Judge McFadden, has reached a contrary conclusion, concluding that "administration of justice" in § 2J1.2 is limited to "a judicial or related proceeding that

determines rights or obligations." *United States v. Seefried*, No. 21-cr-287, ECF No. 123, at 1 (D.D.C. Oct. 29, 2022) (TNM); *see United States v. Rodean*, No. 21-cr-57, ECF No. 76 (D.D.C. Oct. 26, 2022) (restricted statement of reasons); *United States v. Secor,* No. 21-cr-157, ECF No. 56 at 17-20 (Oct. 24, 2022) (TNM); *United States v. Hale-Cusanelli*, No. 21-cr-37, ECF No. 120 at 50-55 (D.D.C. Sep. 27, 2022).   Judge McFadden's reasons for reaching that conclusion, however, are not persuasive.

Judge McFadden first discussed Black's Law Dictionary's definitions of "administration of justice" and "due administration of justice," which, he concluded, "suggest that the 'administration of justice' involves a judicial or quasi-judicial tribunal that applies the force of the state to determine legal rights."   *Seefried*, ECF No. 123 at 4.   He also considered that dictionary's definition of "obstructing" and "interfering with" the administration of justice, a definition that he determined "further corroborates that the 'administration of justice' involves something like a legal proceeding, such as a trial or grand jury hearing."   *Id.* at 5.   But Judge McFadden did not consider the broader definitions of "justice" and "obstruction of justice" cited above, which relate to the orderly administration of the law more generally.   Indeed, Black's Law Dictionary recognizes that "[c]onduct that defies the authority or dignity of a court *or legislature* . . . . interferes with the administration of justice."   Black's Law Dictionary (11th ed. 2019) (emphasis added).

Nor does Judge McFadden's corpus linguistics analysis support a different result. Surveying a representative sampling of 375 uses of the term "administration of justice" in legal usage between 1977 and 1987, Judge McFadden found that about 65% of the hits referred to "a judicial proceeding deciding legal rights," about 4% involved "law enforcement activities," and only three entries "referr[ed] to government function generally."   *Seefried*, ECF No. 123 at 11-

13.   But the simple fact that the term *usually* bears judicial connotations does not mean that it *must*, particularly where, as here, the guideline's context, purpose, and commentary point in a different direction.   Like all words, legal terms often bear multiple meanings.   For example, the term "suppression of evidence" can refer either to a court's exclusion of evidence from trial or to the prosecution's withholding of favorable evidence from the defense.   Which meaning the term bears in a particular instance cannot be determined by the frequency of each meaning within the legal corpus.   And in this case, the frequent use of other meanings is no reason to reject a broader meaning of "administration of justice" that gives full effect to the guideline and corresponds with the commentary's definition.

Judge McFadden was also incorrect in his analysis of § 2J1.2's commentary.   *Seefried*, ECF No. 123 at 14-17.   As an initial matter, he questioned whether the commentary was even "authoritative," pointing out that the D.C. Circuit "has suggested that courts should eschew deference to the Commission when the commentary expands the meaning of the text of the Guidelines themselves."   *Id.* at 14 (citing *United States v. Winstead*, 890 F.3d 1082, 1092 (D.C. Cir. 2018)).   But *Winstead* involved a very different situation, in which the guideline's text included a specific list of crimes defined as "controlled substance offenses" and the commentary added an additional *attempt* crime that was "not included in the guideline."   *Winstead*, 890 F.3d at 403.   The D.C. Circuit held that "[b]y purporting to add attempted offenses to the clear textual definition," rather than "interpret[ing] or explain[ing] the ones already there," the commentary conflicted with the guideline and was not authoritative under *Stinson*.   *Id.* at 404.   Here, by contrast, the commentary does not attempt to add to a finite list of offenses, but rather "explain[s]"

that the term "administration of justice" bears a broad meaning that includes non-judicial proceedings.

Nor was Judge McFadden correct that—even if it is binding—§ 2J1.2's commentary supports only "a narrower interpretation of the 'administration of justice.'" *Seefried*, ECF No. 123 at 15. Although the other definitions in the commentary undoubtedly relate to "investigations, verdicts, and judicial determinations," that fact does not support a definition that excludes congressional proceedings. The commentary's use of the word "includes" indicates that the definition is not an exhaustive list. *See* Antonin Scalia & Bryan A Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012). And the inclusion of the "premature or improper termination of a felony investigation" indicates that the definition applies to executive-branch investigations that are not yet before a grand jury or court.

Reading the commentary's use of the word "governmental . . . resources" to include congressional resources would not, as Judge McFadden concluded, "render[ ] the phrase 'or court' superfluous." *Seefried*, ECF No. 123 at 17. Although a "broad definition" of "governmental" could "include court resources," *id.*, using both terms in an attempt to sweep in all three branches of government is hardly an obvious superfluity. The Sentencing Commission could have added the word "court" to clarify that the term "governmental" did not exclude courts. And the purported superfluity could be avoided by reading "governmental . . . resources" to refer to the resources of both the executive and legislative branches (as opposed to the judicial). The superfluity canon provides no basis to limit the term to "*prosecutorial* resources." *Id.* Moreover, Judge McFadden's interpretation of the commentary runs into its own superfluity problem. If, as he concluded, the term "administration of justice" in § 2J1.2 refers only to "a judicial or related

proceeding," *id.* at 1, then the word "governmental" is itself superfluous.   This reading should be rejected.

Judge McFadden's concern that a broader reading of "administration of justice" would allow the government to "trigger the enhancements at will" is also misplaced.   *Seefried*, ECF No. 123 at 16.   The enhancements in § 2J1.2 do not apply whenever the offense "caused unnecessary expenditures of its resources" in some attenuated way, such as by causing the government to later bring a prosecution.   *Id.* ("While the events of January 6 caused the Government to commit significant resources—evidenced in part by the number of cases charged in this district—this argument proves too much.").   Instead, the enhancement is best read as applying where the obstructive conduct itself—not the later prosecution of that conduct—caused the unnecessary expenditure of substantial governmental or court resources.   *See United States v. Harrington*, 82 F.3d 83, 87 n.2 (5th Cir. 1996) (observing that the case resulted in the expenditure of "substantial resources . . . over and above the routine costs of prosecuting the obstruction offense").   If the enhancement could truly be triggered simply by "charg[ing]" a case, *Seefried*, ECF No. 123 at 16, then even under Judge McFadden's reading the enhancement would apply every time the government brought a felony prosecution, which results in the expenditure of substantial "court" and "prosecutorial" resources, *id.* at 16-17.   Judge McFadden's conclusion that "governmental" should be read to exclude Congress simply does not follow from his concerns about excessive application of the enhancements.

Judge McFadden was also incorrect in perceiving a conflict between the government's interpretation of "administration of justice" in § 2J1.2 and the same term in 18 U.S.C. § 1503, which contains a catchall provision prohibiting obstruction of "the due administration of justice."

*See Seefried*, ECF No. 123 at 5-6 (observing that the government had not charged any January 6 defendants under § 1503), 20-21 (saying it would be "incongruous" to conclude that "official proceeding" means something different in the Sentencing Guidelines than in the statutory context). The Supreme Court has made clear that a term can have a different meaning in the Sentencing Guidelines than it does in a statute. *DePierre v. United States*, 564 U.S. 70, 87 (2011). And there are at least three differences between § 1503 and § 2J1.2 that counsel in favor of reading them differently. First, unlike § 1503, § 2J1.2 includes its own definition of the "administration of justice," which covers the expenditure of "governmental *or* court" resources. Second, § 1503 appears in the context of a statute that applies to jurors, court officers, and judges, which may favor a narrower reading of the catchall provision for interference with the "due administration of justice." And, third, § 2J1.2's entire purpose is to distinguish between levels of culpability for those who violate a wide variety of obstruction statutes, many of which are not limited to judicial or quasi-judicial proceedings.

Judge McFadden's reading of § 2J1.2 also creates difficult line-drawing problems. Under his reasoning, the enhancements in subsection (b)(1)(B) and (b)(2) apply only to offenses where the obstructed proceedings were "judicial" or "quasi-judicial" in nature. *Seefried*, ECF No. 123 at 4. But those terms themselves raise difficult questions about how closely the obstructive conduct must "relate[]" to a judicial proceeding or what proceedings can be said to "determine[] rights or obligations." *Id.* at 1. For example, 18 U.S.C. § 1505 applies to obstruction of an investigation by the House Ethics Committee, which has the power to discipline current members of Congress. That inquiry would seem to be "quasi-judicial" and one that "determines rights or obligations," *id.* at 1, 4, yet it does not involve the "possibility of punishment by the state," *id.* at

47

4.   The government's broader reading of "administration of justice," by contrast, would apply to all the obstruction offenses covered by § 2J1.2.   Under the government's reading, therefore, a sentencing court need not answer difficult questions about whether a proceeding is sufficiently "judicial" or "quasi-judicial" to trigger subsections (b)(1)(B) and (b)(2).

Moreover, even under a narrower reading of administration of justice, the certification fits within the definition because it has quasi-judicial features.   The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election.   3 U.S.C. § 15.   As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection.   *Id.*   Congress's certification of the Electoral College vote, moreover, must terminate with a decision: Congress may not recess until "the count of electoral votes" is "completed," and the "result declared."   3 U.S.C. § 16.   Indeed, for these reasons, several judges on this Court have concluded that Congress's certification of the Electoral College is a "quasi-adjudicative or quasi-judicial" proceeding.   *United States v. Nordean*, 579 F. Supp. 3d 28, 43 (D.D.C. 2021); *see United States v. Robertson*, 588 F. Supp. 3d 114, 121-22 (D.D.C. 2022) (holding that "the certification of the Electoral College vote is quasi-adjudicatory"); *United States v. Caldwell*, 581 F. Supp. 3d 1, 14-15 (D.D.C. 2021) (holding that the certification was "an 'adjudicatory' proceeding").

### 4.   The Facts of Tenney's Case Require the Court the Apply the § 2J1.2(b)(1)(B) Enhancement

The eight-point enhancement for "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," U.S.S.G. § 2J1.2(b)(1)(B), applies to Tenney's conduct on January 6, for multiple reasons. First, where a

defendant directly caused injury, threatened injury, or damaged property, this enhancement applies based upon the defendant's own acts under § 1B1.3(a)(1)(A). Tenney grabbed J.G. of the Sergeant at Arms from behind and pushed him into a doorframe. Ex. 1 at 0:30-0:47. He locked arms with U.S. Capitol Police Officer B.A. *Id.* at 1:00-1:08. He shoved U.S. Capitol Police Officer J.M.G. *Id.* at 1:52-1:56.

Tenney was so aggressive toward officers that, when another rioter pulled Officer B.A. to the ground, Youngers – Tenney's own friend – and another rioter recognized the threat he posed to officer safety and spread their arms wide to keep Tenney away from Officer B.A. Throughout the encounter at the Rotunda Doors, Tenney's verbal and body language – specifically, yelling "stand up, Patriots, stand up!" and jabbing his finger at officers and he moved close to them and spoke heatedly – is yet another sign of Tenney's aggressive behavior, behavior that communicated a threat to officers.

Tenney also threatened to cause property damage. After he tried to open the Rotunda Doors and could not, he threw his weight against the door, which could have jammed or otherwise damaged it.

Any single one of these actions could be enough to support the enhancement; collectively, they leave no doubt that the enhancement should apply based on Tenney's own conduct.

In addition, U.S.S.G. § 1B1.3(a)(1)(A) encompasses both the defendant's own acts or omissions and those whom the defendant aided, abetted, counseled, commanded, induced, procured, or willfully caused. Furthermore, Tenney is responsible for "all acts … of others involved in jointly undertaken criminal activity" with the defendant if those acts were "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity,

and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). That provision does not require evidence of pre-planning or conspiracy; its plain terms apply to persons who acted in unison to achieve a common goal.

Here, Tenney worked with other rioters to open the Rotunda Doors, contributing to a violent assault of Officer B.A., as seen in Exhibit 1 at 2:20-2:36.   When Officer B.A. returned to the Rotunda Doors to defend them, Tenney and three others approached the one door that remained closed and started struggling with Officer B.A. over it.   With Officer B.A. focused on his struggle with Tenney and the others over the door, he was defenseless from behind; another rioter – Kaleb Dillard, who had entered through the East Rotunda Doors, in the breach Tenney caused – approached officer B.A. from the back and moved him away from the door by grabbing his chinstrap and throwing him to the ground, an undeniably violent moment.   Moreover, the Court may also consider the threats to injury and property caused by the approximately 48 rioters whom Tenney helped to enter the building.[8]   These rioters' actions were within the scope of the jointly undertaken criminal activity, committed in furtherance of it, and reasonably foreseeable to Tenney when he helped them enter the building, particularly given that he had already witnessed rioters threatening police by that point.

Tenney's arguments against the enhancement are not persuasive.   To claim that he never caused or threatened injury or property damage, he isolates selected individual moments in his

---

[8] Rioters who entered in this first breach of the Rotunda Doors include Christopher Warnagiris, who has been charged with violations of 18 U.S.C. § 111(a) and other statutes (*United States v. Warnagiris,* 21-cr-382; Kaleb Dillard, who grabbed Officer B.A. from behind and violently threw him to the ground (Complaint, Dkt. 1, *United States v. Dillard,* 22-mj-189); and Audrey Southard-Rumsey, who has been charged with five violations of 18 U.S.C. § 111(a) (assaulting, resisting, or impeding officers), including four committed while inside the Capitol.   *United States v. Southard-Rumsey,* 21-cr-387.

struggle over the doors with multiple officers, ignoring others.   He cannot explain away his entire course of conduct.

Tenney claims that "at no point" did he "assault or threaten" J.M.G.   Tenney Sent. Mem., ECF No. 70 at 5.   He ignores the fact that he pushed J.G. into a door jamb.   Ex. 1 at 0:32.   Tenney and another rioter then moved close to J.G. and Tenney jabbed his finger at J.M.G.'s chest.   *Id.* at 0:37.   This was threatening behavior.

Tenney also argues he "seem[ed] concerned with letting people into the building who are pressed against the door with two broken windows." ECF No. 70 at 5, 8. [9]   This post-hoc rationalization is contrary to the evidence.   If rioters were truly "pressed against the door," as Tenney claims, he would not have been able to open the door outward, as he did.   On the surveillance video, there do not seem to be any rioters pressed up against the door before Tenney opened it; at most, a Capitol police officer's jacket is visible close to one door.   Moreover, throughout the offense, Tenney saw that the police, the officers entrusted with ensuring safety, wanted the doors closed – and he continued to fight them over it.   Furthermore, none of Tenney's recorded statements suggest that a safety concern motivated him.   Rather, his focus was on encouraging rioters to rise up ("come on, Americans!") and the police to stand down ("we are one of you!").   And, when the FBI interviewed Tenney, he made several self-serving statements (such as that helped fallen officers to their feet), but he never mentioned opening the doors to keep people safe; this explanation only emerged once he was confronted with the evidence showing his conduct at the Rotunda Doors.

---

[9] Note that Tenney does not actually say that he *was* concerned about others, only that it "seem[ed]" that way.

As another example, Tenney claimed he "gently pull[ed] the demonstrator away from B.A., seemingly in an effort to diffuse any potential conflict between the two."   ECF No. 70 at 6.   Not so.   Seconds later, Tenney himself moved forward and inserted himself into the middle of the conflict with Officer B.A., waving his finger at the officer as he yelled, "We are one of you!"   Ex. 1 at 1:36-1:47; Ex. 2 at 0:14-0:32.   Rather than diffuse tensions, it appears that Tenney wanted to be the one to confront Officer B.A.   And again, none of Tenney's words, recorded on video, suggest that he intended to be a peacemaker.

Tenney also notes that Officer B.A. walked past Tenney at one point (Ex. 1 at 3:20), suggesting that the officer's decision to do so "proves" that Tenney must not have intended any physical harm because Officer B.A.'s back was briefly to Tenney as he left the area.   ECF 70 at 7-8.   This is a leap.   An officer can walk away from someone he perceives to be a threat.   And an officer's perception of who poses a threat can change from minute to minute.   Tenney had grappled with Officer B.A. two minutes earlier – since then, Officer B.A. had been the victim of a serious assault committed by someone else: he was grabbed from behind and thrown to the ground. He was surrounded by threats – not just from Tenney – and walked to Rotunda, a room with more open space.   Tenney reads too much into Officer B.A.'s decision to walk away from Tenney and the area where he had just been assaulted as he continued to recover.

Tenney also ignores the fact that he shoved Officer J.M.G.   Nor does he address the application of the enhancement based on injuries or property damage caused by others.   Thus, when the Court looks at Tenney's course of conduct as a whole, the government has shown by a preponderance of the evidence that he caused or threatened injury or property damage.   It should apply the enhancement under U.S.S.G. § 2J1.2(b)(1)(B).

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

Sentencing is ultimately guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, several of the factors, the nature of the offense chief among them, justifies a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at the defendant's individual conduct, this Court, in determining a fair and

53

just sentence, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

Here, Tenney's conduct on January 6 was aggravated by reference to the first four factors, as well as the seventh, eighth and ninth. Tenney scaled a wall to enter the Capitol. He encouraged violence and destruction of property, both by his own violent acts, and by ushering other rioters into the Capitol at the Rotunda Doors. His reaction to the violence around him as he was entering the Capitol was to exacerbate it. His statements before, during, and shortly after January 6 show he was eager to attack on the Capitol to stop the certification vote. While inside the Capitol, he fought the efforts of police to keep the rioters out of the Capitol building. Although he ultimately expressed remorse for his crimes on January 6, it came long after the fact, and after he falsely minimized his participation in the riot when speaking to FBI agents. He also continues to minimize, by persisting in the claim that his motivation was to protect the safety of those he feared were trapped outside the Rotunda Doors.

All told, the nature and circumstances of this defendant's crimes weigh heavily towards a significant term of incarceration. Tenney's statements prior to the riot demonstrate that he was

prepared for violence – and even specifically contemplated a "siege" of the Capitol.   He also sought to link up with militia groups, indicating a willingness to turn to violence.

Upon approaching the Capitol, Tenney unlawfully scaled a wall to access the Upper West Terrace, arriving at the exact spot that his codefendant, Youngers, had identified as a place where they were not supposed to go.   There, while Youngers hung back, Tenney made his way to the front of a mob of rioters outside the Parliamentarian door who had raised their fists and yelled at an outnumbered group of officers.   From there, Tenney entered the Capitol with Youngers.   After celebrating, they made their way to the East Foyer, where only the Rotunda Doors and a small group of officers were the last line of defense against hundreds of rioters who had amassed outside. Members of Congress had not yet been evacuated; entering the Capitol through the Rotunda Doors would allow rioters to advance to the House or Senate Chambers within minutes.[10]

Tenney's conduct in the East Foyer is what makes this case so serious.   He was the first rioter to open the Rotunda Doors.   He was the original instigator of one of the two largest breaches of the Capitol Building that day.   Because of Tenney, dozens of rioters entered the Capitol. Police were assaulted.   Congress was threatened.   Property was damaged.   Democracy was put on hold.

And Tenney did not simply open some doors.   He fought officers.   He grabbed an employee of the House Sergeant at Arms and shoved him into the doorframe.   He locked arms with Officer B.A.   He pushed Officer J.M.G.   He was defiant, confrontational, and verbally

---

[10]  Indeed, within ten minutes of Tenney's breach of the Rotunda Doors, a large crowd of rioters gathered in the Statuary Hall Connector, where a standoff with a small group of officers occurred.   The rioters soon overwhelmed the officers and advanced all the way to the doors to the House Chamber.   *See, e.g.,* Complaint, *United States v. Southard-Rumsey,* 21-cr-387 (APM), Dkt. 1.

aggressive throughout.

In his FBI interview, Tenney claimed he had opened the doors because he was worried that rioters outside were getting crushed.   As explained above, this excuse is not persuasive.   Not even those on his side thought Tenney was just trying to keep others safe: Youngers tried to keep him back from Officer B.A. and finally pulled him away from the area.

**B.  The History and Characteristics of the Defendant**

To Tenney's credit, he has no criminal history.   Since January 6, however, his interactions with law enforcement reflect minimization and, at times, dishonesty.   When he gave an interview that night, he wore face and head coverings and sunglasses.   In the days following the attack, his messages with Individual-1 similarly suggest an attempt to cover up what he did, asking Individual-1 to take down videos and attempting to coordinate stories.   When the FBI approached Tenney, he did admit to entering the Capitol, but lied about the specifics of his conduct, such as by claiming (1) that he saw no police presence until he got inside; (2) was only inside for three or four minutes, (3) entered 45-60 minutes after the breach of the building, and (4) helped fallen officers to their feet.

In his February proffer, Tenney expressed remorse for his conduct.   He told the government he was no longer immersed in conspiracy theories and false claims about the election, and he explained how his exposure to such claims on social media had motivated his participation in the events of January 6.   He did, however, claim that his actions in the East Foyer were motivated by a desire to rescue people.   As explained above, the evidence – and Tenney's subsequent guilty plea – contradicts this assertion – leading the government to conclude that he was continuing to minimize.   By eventually pleading guilty, however, Tenney did eventually

accept responsibility – although his sentencing memorandum continues to minimize the threat he posed to officers near the Rotunda Doors and continues to suggest he was just trying to protect the health and safety of others.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[11] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Tenney's criminal conduct, battling police officers and corruptly obstructing an official proceeding, is the epitome of disrespect for the law. When Tenney entered the Capitol grounds then the Capitol itself, it was abundantly clear to him that lawmakers, and the police officers who tried to protect them, were under siege. Police officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D. The Need for the Sentence to Afford Adequate Deterrence

---

[11] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[12] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I

---

[12] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

There is some need for specific deterrence here.   In the weeks leading up to January 6, Tenney embraced conspiracy theories and false information on social media.   He expressed interest in joining the Proud Boys or another a militia group.   Tenney's willingness to act on these influences by traveling to Washington, D.C., storming the Capitol, and engaging in violence against police officers, is cause for concern.

Such influences persist in society.   Social media is pervasive.   Tenney will most likely confront these forces again.   He must be deterred so that never again does he become motivated by what he reads online to engage in acts of violence as he did on January 6 – acts of violence against both officers and the rule of law.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96

(2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a

backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of

the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[13]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the cases discussed below provide suitable comparisons to the relevant sentencing considerations in this case.

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing

---

[13] The Guidelines ranges in Capitol siege cases may be more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

One other defendant, Thomas Robertson, has been sentenced for the same violations as Tenney – 18 U.S.C. § 1512(c)(2) and 231(a)(3).   He was sentenced to 87 months' imprisonment. Tenney's sentence should be lower – he did not go to trial, so he will receive credit for acceptance of responsibility, and he did not receive an enhancement for destroying evidence, as Robertson did.   Tenney, however, facilitated many more rioters' unlawful entry into the Capitol than Robertson did. And worse, Tenney, unlike Robertson, put his hands on multiple officers.

The Court should also consider the sentences imposed on defendants who pled guilty to violations of 18 U.S.C. § 1512(c)(2) but who did not physically engage with officers, as Tenney did.   Joshua Pruitt, for example, received a mid-range sentence of 55 months' imprisonment (he was in Criminal History Category III, unlike Tenney).   *United States v. Pruitt,* 21-cr-23 (TJK). Pruitt received an eight-point enhancement largely because he threw a sign (threatening property damage) and verbally confronted officers.   Unlike with Tenney, however, the government did not present evidence that Pruitt actually shoved or otherwise aggressively touched officers.   Judge Kelly noted that Pruitt "amped up" the crowd – Tenney literally opened the doors for them.   Pruitt did have the additional aggravating factor of coordinating his plans for January 6 with the Proud Boys.   Tenney's evidence of preplanning is less extensive but noteworthy nonetheless – unlike Pruitt, Tenney himself spoke of actually sieging the Capitol.   And Tenney expressed interest in joining militias (and boasted about having met Oathkeepers in Washington), although the

government is not aware that he actually did so.   Finally, unlike Pruitt, Tenney has been convicted of two felonies, not one.

In *Rubenacker,* 21-cr-193, Chief Judge Howell sentenced the defendant to 41 months' incarceration, the bottom of his 41-51 month Guidelines range.   As noted above, Rubenacker's Guidelines range included both enhancements under 2J1.2(b), despite the fact that Rubenacker did not directly engage in violent or destructive conduct. Chief Judge Howell found that Rubenacker's "physical movements inside the Capitol communicated threats to law enforcement" and his "yelling and taunting at the officers … was threatening conduct, regardless of what he said and whether those words contained threats of physical injury to those officers" in the context of an angry mob confronting police and refusing to comply with directions to leave the area.   While his Guidelines range is the same as Rubenacker's, Tenney, unlike Rubenacker, physically engaged officers.   Tenney's sentence should be higher to account for the fact that his conduct went beyond a threat of violence to an actual physical confrontation.   And Tenney is nearly beyond compare when it comes to facilitating illegal activity by others, as he did when he fought off J.G. to open the Rotunda Doors.

Tenney's sentence should also be higher than Christian Secor's.   Judge McFadden sentenced Secor, a 22-year-old college student, to 42 months' imprisonment.   Secor pled guilty only to a violation of 18 U.S.C. § 1512(c)(2).   As noted above, Judge McFadden is the only judge to find the enhancements under U.S.S.G. § 2J1.2(b)(1)(B) and (b)(2) inapplicable to obstruction of the certification.   As a result, Secor's guidelines range was substantially lower.   While Secor did engage in certain aggravating conduct that Tenney did not (deleting evidence and entering the Senate Chamber), Judge McFadden distinguished Secor's obstructive conduct as "about as blatant

and obstructive as any I've seen from that day that do[es] not involve actual violence against law enforcement." *United States v. Secor*, 21-cr-157, Oct. 9, 2022 Sentencing Hrg. Tr. at 49. Tenney's conduct, which did involve physical violence against an employee of the House Sergeant at Arms and Capitol Police officers – is thus in a higher category.

Mitigating factors present in three § 1512(c)(2) cases—*United States v. Michetti*, 21-cr-232 (CRC) (defendant was sole financial support for his minor child and proactively engaged in post-offense rehabilitation), *United States v. Miller,* 21-cr-75 (RDM)(defendant's age, possible intoxication at time of offense, and "otherwise exemplary behavior" warranted variance), and *United States v. Hodgkins*, 21-cr-188 (RDM) (defendant took "exceptionally" early guilty plea, made no threats or acts of violence, and took significant steps taken towards rehabilitation)— resulted in non-Guidelines sentences. Additionally, two of those three defendants, Michetti and Hodgkins, did not face an 8-point enhancement under U.S.S.G. § 2J1.2(b)(1)(B), and did not threaten injury (let alone actually attack officers).   Their Guidelines ranges were thus far lower. No similar constellation of mitigating factors is present here.

Given that he physically opposed, resisted, and interfered with officers, Tenney's conduct in some ways most closely resembles that of defendants convicted under both 18 U.S.C. § 111(a)(1) (assaulting, resisting, and impeding officers) and 18 U.S.C. § 1512(c)(2) (or 18 U.S.C. § 1512(k)) for their conduct on January 6.   Those defendants have been sentenced to between 41 and 51 months.  *See Wilson*, 21-cr-345 (RCL) (51 months), *United States v. Fairlamb*, 21-cr-12 (RCL), and *United States v. Neefe and Smith*, 21-cr-562 (RCL) (41 months).

Finally, Tenney is readily distinguishable from his co-defendant, Darrell Youngers, who was charged only with misdemeanors and sentenced to probation.   Youngers did not assault or

physically confront multiple officers, as Tenney did.   Nor did he open the Rotunda Doors to

dozens of rioters.   Youngers also presented mitigating evidence not present here to show that,

after initially celebrating the breach, he made some effort to de-escalate the situation.   He helped

Officer B.A. when the officer's radio cord became tangled around a bench.   When he saw officers

struggling near that bench, he pushed it away.   And, after Officer B.A. was violently pulled to the

ground, he sought to keep Tenney away.   Finally, to the government's knowledge, Youngers did

not contemplate storming the Capitol before January 6, nor did he express interest in joining militia

groups or boast about making contact with them, as Tenney did.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579,

96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes."[14] *United States v. Papagno*, 639

F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."

*See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[14] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

Those principles have straightforward application here. The victims in this case did not suffer bodily injury as a result of Tenney's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Tenney must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Tenney played in the riot on January 6.[15] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Tenney's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 141.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 48 months, which within the Guidelines range calculated by the government, restitution of $2,000, no fine, three years' supervised release, and the mandatory $100 special assessment for each count of conviction.

---

[15] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052


By:     /s/ Alexis J. Loeb
        ALEXIS J. LOEB
        CA Bar No. 269895
        Assistant United States Attorney
        (Detailed to USAO-DC)
        U.S. Attorney's Office
        450 Golden Gate Ave.
        San Francisco, CA 94102
        Office: 202-415-7168
        alexis.loeb@usdoj.gov