# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 1:21-cr-640-1 (CKK)** |
| | ) | |
| **GEORGE AMOS TENNEY III,** | ) | |
| Defendant. | ) | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO REDUCE SENTENCE AND MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes defendant George Amos Tenney III's two *pro se* motions: a motion to reduce his sentence under U.S.S.G. § 4C1.1 (Amendment 821) (ECF No. 81), and a motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence under the D.C. Circuit's ruling in *United States v. Brock,* 94 F. 4th 39 (D.C. Cir. 2024), which found that certain Sentencing Guidelines enhancements do not apply to efforts to obstruct the certification of the electoral college vote (ECF No. 82). Neither has merit.

Tenney is ineligible for a reduction in sentence under U.S.S.G. § 4C1.1 because he assaulted three officers in the Capitol; therefore, his offense involved violence. As to the claims under 18 U.S.C. § 2255, which seek to correct the calculation of his advisory guidelines range, none are cognizable on habeas review, and they are procedurally barred by his plea agreement, the one-year limitations period, and Tenney's failure to file a direct appeal. Were the Court to reach the merits and resentence Tenney, Tenney would not be entitled to relief because Tenney's 36-month sentence is justified under 18 U.S.C. § 3553(a), given his violent effort to stop the certification. Tenney assaulted an employee of the House Sergeant at Arms and pushed two Capitol Police officers; he was the first rioter to open the Rotunda Doors, and he bears

particular responsibility for causing one of the two most significant breaches of the building. His statements before January 6 contemplated violently storming the Capitol, making his actions that day more serious than some impulsive aberration. Such conduct, in the context of a mob effort to disrupt the peaceful transfer of power, would warrant an upward variance from a lower Guidelines range, and 36 months would be an appropriate sentence under 18 U.S.C. § 3553(a).

## FACTUAL BACKGROUND

Because Judge Hogan presided over this case through sentencing, the government provides a detailed description of Tenney's offense conduct here.

### I.    Tenney's Messages Before January 6 Contemplate Violence and Revolution

In late 2020, Tenney, a resident of South Carolina, was an administrator for a political Facebook page, the PowerHouse Patriot. Tenney's friend, Individual-1, ran PowerHouse Patriot. Tenney made plans to travel with Individual-1 to Washington, D.C. Before January 6, Tenney exchanged digital messages with Individual-1 and others regarding his plans. These messages show that Tenney sought to join extremist groups, including the Proud Boys, and was aware that plans to "siege" the Capitol were underfoot.

After the 2020 presidential election, Tenney exchanged numerous messages and reports making various claims of election fraud that had supposedly cost Donald Trump the presidency. On November 27, 2020, referring to the election, Tenney messaged Individual-1, "If we [don't] win this, THERE WILL BE A REVOLUTION! No other option in my opinion." On December 14, Tenney asked Individual-1, "Where and how do I get involved or a part of one of these patriot

revolution groups? Like proud boys, or any of the other American Patriot Militias??"  He also exchanged numerous messages regarding election fraud.

After Donald Trump announced plans for a "wild" protest in Washington D.C. on January 6, Tenney began to make plans with Individual-1 to attend. On December 27, Tenney wrote on Facebook: "I heard over 500k armed militia patriots will be in DC by the 4th. And will start early waiting for rest of us on the 6th.

we should talk bout it. The people I'm going, we are forming plans for every scenario. What you think?

(Emphasis added).

The following day, Tenney also reported talk of "siege" and "domestic war" – which "patriots and Americans" could stop by being the "end all force of change," further portending the violence that would take place at the Capitol:

> I've been watching these pod cast things from this guy. He says Pence is a traitor and will betray the US on the 6th. Then flee the country. Biden will go in. Then long story short country goes into this schedule of domestic war and siege. Bloodshed and so on. . . They are expecting patriots and Americans to be the end all force of change I'm leaving soo much out and can't remember shit. But it was a lot. You wanna see it?

On January 4, Tenney encouraged a friend to join him on the trip, describing it as "something I believe will save our country." On January 5, Tenney again asked Individual-1 if he had "heard or seen anything going on today in DC? Like proud boys / militia groups etc."

## II.     Tenney's Arrival in D.C. and Breach of the Capitol

In the early-morning hours of January 6, Tenney and Individual-1 drove to Washington, D.C., where Individual-1 had booked accommodation at the Hampton Inn. After arriving, Tenney and Individual-1 went to the rally in support of President Trump. They met and befriended Tenney's co-defendant, Darrell Youngers, a former Marine who had traveled to Washington from Texas. After the rally, the group marched to the U.S. Capitol. They stopped just outside the Capitol Grounds, near roadblocks labeled "STOP." Filming a video, Youngers reported on the status of the certification, noting that objections to Arizona's vote had been lodged. They also commented on the indications of unrest that they were seeing: a noise that sounded like a "cannon" going off, police, in Youngers' words, "hauling ass," and an announcement they heard over a police radio calling for officers who were protecting the windows to go to the West Side of the Capitol.

Youngers commented, "something's going on," and asked the others, "you guys hear that on the radio, fire in the hole?"  The group also noticed what they thought were SWAT teams approaching the Capitol.

Tenney and Youngers advanced forward on to Capitol Grounds, where it soon became apparent what was happening. Youngers filmed a video where he narrated, "people have just stormed the front of the Capitol building, through tear gas…people aren't supposed to be up there, but they're there." When they got closer to the building, they saw that the staircase leading up toward an entrance was clogged with rioters, so they scaled a wall to reach the Upper West Terrace instead. On the Upper West Terrace, Youngers filmed a confrontation between police and rioters outside the Parliamentarian Door. In the video, rioters can be seen throwing objects at the police. In what would soon become a pattern, Youngers hung back while Tenney ran ahead and joined a group of rioters verbally confronting the police, jabbing his finger in the air, as shown in Image 1, below (the yellow arrow identifies Tenney).



Image 1

Youngers and Tenney then advanced to the Senate Wing Doors and entered the U.S. Capitol Building at approximately 2:19 p.m., less than ten minutes after the initial breach. Alarms blared, and broken glass was visible on the floor. *See* Image 2.



Image 2

Once inside the area, Youngers filmed a video and turned the camera on himself and Tenney as he rejoiced, "We are inside the Capitol Building. It has been overrun. The Capitol Building has literally been broken into." He yelled, "this is what a revolution motherfucking looks like!" *See* Image 3, below.



Image 3

Tenney also filmed a video with his cell phone. Tenney and Youngers walked down a hallway and climbed a set of stairs. They passed through the Rotunda. Again, Tenney moved ahead of Youngers. He entered the East Foyer, a wide hallway between the Rotunda and the Rotunda Doors, which led to the East Front outside the Capitol. The Rotunda Doors had not yet been breached and were being defended by a small number of officers who were outside the doors, trying to hold off a large crowd of rioters.

### III.   Tenney Causes the First Breach of the Rotunda Doors and Shoves an Employee of the House Sergeant at Arms

As seen in Exhibit 1, a clip from U.S. Capitol Police surveillance video, Tenney approached the closed Rotunda Doors, lowered his shoulder, and unsuccessfully tried to push one

of the doors open. He then tried the other door. After about 20 seconds, he tried again, and succeeded in opening the door to the left.[1]  *See* Image 10, below.



Image 10

A police officer outside tried to push them closed, and Tenney resisted, pushing against the door to try to keep it open and trying to wedge his body in the doorframe. Employee J.G. of the House Sergeant at Arms entered the East Foyer from the direction of the Rotunda and ran toward Tenney. He pulled Tenney away and tried to close the door. Youngers followed behind J.G., and approached when he saw Tenney and J.G. struggling.

J.G. faced outside as he tried to push rioters away and close the doors. Tenney ran back toward the door and grabbed J.G. from behind, pushing him toward the doorframe. J.G.'s head appeared to make contact with the doorframe because of Tenney's push. *See* Image 11, below.

---

[1] The door Tenney opened was an emergency door with a red sign on a stand in front of it that read: "EMERGENCY EXIT ONLY PUSH UNTIL ALARM SOUNDS (3 SECONDS) DOOR WILL UNLOCK IN 15 SECONDS."



Image 11

Image 12, below, is a close-up of the same motion:



Image 12

J.G. turned to face Tenney, who pushed against J.G.'s chest. See Image 13, below.



Image 13

Image 14, below, is a closer view during the same interaction:



Image 14

Tenney and J.G. had a heated conversation, with Tenney jabbing his finger at J.G.'s chest.

Two other rioters joined Tenney, confronting and surrounding J.G. *See* Image 15, below.



Image 15

In an interview, J.G. told the FBI that he recalled a heated exchange, with Tenney saying something along the lines of, "You're not going to stop us" and "there's [x number] of us." Youngers picked up the red sign and moved it away from the center of the doors.

Next, a rioter from outside the doors forced his way inside and pushed J.G. back, away from the doors. Tenney continued to stand in the doorway. *See* Image 16, below.



Image 16

Tenney then reached forward, and locked arms with Capitol Police officer B.A. as Officer B.A. entered the East Foyer from outside. *See* Images 17 and 18, below.



Image 17



Image 18

Tenney put his hand on Officer B.A.'s chest as the two separated, and then grabbed

Officer B.A.'s arm. See Image 19, below.



Image 19

While Officer B.A. was occupied with Tenney, another rioter was able to breach the building behind him.

Youngers moved in and touched Officer B.A.'s arm too, as if to move it away from Tenney. In Image 20, below, from Capitol Police security footage taken from a different angle, a yellow arrow points to Tenney, and a red arrow points to Officer B.A.



Image 20

Officer B.A. turned toward Tenney, and Tenney and Youngers shuffled backward toward the Rotunda, as if retreating. Officer B.A. followed them. Officer B.A. adjusted his belt and turned around to return to fight the rioters' continuing effort to breach the Rotunda Doors. Tenney yelled "Stand up, patriots, stand up!" *See* Image 21, below.



Image 21

Less than 20 seconds after leaving the East Foyer, Tenney also returned to the area, where he continued to try to facilitate rioters' efforts to invade the Capitol. Officer B.A. was standing by the door, trying to keep rioters out. Tenney walked up to confront Officer B.A. again, yelling "we are one of you!" *See* Image 22, below.



Image 22

When Tenney moved in to interfere with Officer B.A., rioters were able to break through the entrance. See Image 23, below.



Image 23



Image 24

They began to pour inside through the one open door. Tenney moved back to make space for them to enter, yelled, "come on, Americans!" and helped the rioters move forward into the building, patting them on the back, as seen in Image 25, below. In Exhibit 2, a clip from the open-source video depicted in Images 21-22, Tenney can be heard yelling, "Stand up, Patriots, stand up!" "we are one of you!" and "come on, Americans!"



Image 25

Tenney did not treat all individuals entering the building equally, however. When Capitol Police Officer J.M.G. entered, Tenney shoved him to the side. See Image 26, below.



Image 26

Officer B.A. remained by the door. Tenney went up to the right-hand-side door, which was still closed, and tried to push it open – which would have allowed even more rioters to enter. Meanwhile, another rioter grabbed Officer B.A. from behind and threw him to the ground. Another officer came to Officer B.A.'s aid. Tenney then approached Officer B.A., but Youngers and another individual tried to keep Tenney away as the assisting officer helped Officer B.A. to his feet. In Image 27, below, a yellow arrow points to Tenney, a red arrow to the officer assisting Officer B.A., and a blue arrow points to Youngers.



Image 27

Youngers continued to try to keep Tenney away.  See Image 28, below.



Image 28

A few more officers arrived on the scene and tried to close the doors. One officer turned

around and hurled himself backward through the door to push the crowd back so that the door

could be closed. Tenney then came up and positioned himself in the door jamb so that the door

could not be closed. *See* Image 29, below.



Image 29

An officer then pushed Tenney back, and another rioter pulled him away from the police.

At about 2:28 p.m., officers finally succeeded in closing the door. By that point, approximately 48

rioters had entered, including several rioters who went on to threaten and assault officers inside

the building.

Tenney moved toward the officers and appeared to verbally confront them. *See* Image 30,

below.



Image 30

Youngers pulled Tenney away from the confrontation and led him out of the East Foyer and toward the Rotunda. An officer ordered them away from the doors and told them to go sit down in a hallway. They retreated through the Rotunda and retraced their steps to the Senate Wing Doors. There, at about 2:32 p.m., approximately 13 minutes after they had entered, Tenney and Youngers left the Capitol Building by climbing out through a window near the Senate Wing Door. They returned to the area of the Upper West Terrace near the scaffolding in place for the inauguration, and then decided that the tear gas in the air was affecting them too strongly and decided to leave.

### IV.   Tenney's Communications Immediately After He Breached the Capitol Celebrated the Events, Plan for Further Violence, and Reflect a Lack of Remorse

That afternoon, Tenney sent a message to his father: "We took the capital!!    It's happening!!!" His father responded that he had heard there was tear gas. Tenney replied, "Yeah. It's bad.  I'll call you to talk. Don't want to text it." Tenney also wrote, ""I was in the first crowd.

It turned bad quick.  The msm [mainstream media] and[]news is LYING!!!" At 4:02 p.m., Tenney wrote, "Pence betrayed us."

In messages sent after January 6, Tenney warned of civil war and spread conspiracy theories and false information about the January 6 attack. He claimed to have met with "very prominent people for some very major groups" in Washington, D.C., including Oath Keepers. Reporting the meeting to a friend, he wrote, in a Facebook message, "It's real…We are in war." He also spread various conspiracy theories. For example, on January 9, 2021, he claimed that the rioters included an undercover military for Trump that was present to obtain documents and computers. On January 10, in a Facebook message, he explained, "[t]here was a military special ops going on in the capitol while 'patriots' were in there. They took 17 computers and dozens of documents. Pelosi went above her head and tried an army coup on Trump. It's bad. It's all going down. We are at war!"  He said that "Americans need to be ready to fight." On January 11, he said, in a Facebook message, "We will not go down!  I saw what America was ready for last week!"

In a January 10 message, he told a contact, "I've been talking with the Oath Takers (marines) I met in DC[]all weekend. I have dozen other messages and video. We are at war. Air space cleared." He claimed, "Trump declared insurrection last night at midnight. The flag on the White House was removed. 6000 troops in DC right now. Martial law and power grid loss is a good possibility." He told the contact that "Trump will communicate with us through Pompeo using the emergency transmi[ss]ion alert."

To another Facebook contact, on January 12, Tenney wrote, "I may or may not have connection with The Oath Keepers, III Percenters, and Proud Boys. All ex Marines and military. I could talk for hours about who and what Antifa/BLM is and how these Patriot groups go from city to city to fight Antifa and protect the people. Antifa is controlled and funded by the FBI and CIA."

In another message, he suggested he was working with militia groups: "But I may or may not be helping some groups during these times right now and I pretty much cannot get off my phone and communicating with certain people in certain places…"  He warned a contact to prepare for martial law and to stockpile survival supplies.

Later that month, on January 24, Tenney noted, "The election was stolen, everyone knows it in politics and military." In the same post, he claimed to have moved on from "that Q mess" – i.e., Q-Anon – although he "want[ed] to believe" it was true.

In addition, Tenney exchanged messages with William Robert Norwood, who has also been charged in connection with his conduct on January 6. On January 18, 2021, Tenney asked Norwood (via Facebook), "What's going on at Capitol?"  Norwood replied that he was watching a live feed that showed smoke coming from the Capitol, although it may be a fire at homeless encampment. Norwood said, "At first, all I saw was people running and smoke lol" and "I was like…OH SHIT!! HERE WE GO!"  Tenney replied, "Yeah, THAT WOULD'VE BEEN AWESOME !!!"

In addition, Tenney exchanged messages with Individual-1, in which they discussed how to shield Tenney from investigations into his actions on January 6. On January 8, Tenney wrote to Individual-1, "You gotta take that video down for now. My work just called investigating." He told Individual-1 that someone had seen one of Individual-1's videos from January 6 that featured Tenney and informed his employer. He further explained, "They are trying to link it to the one in the mask" (the interview from Tenney's hotel the night of the 6th). The next day, Individual-1 reported to Tenney that Norwood was on the news, but was not worried because "all they can do is tell him never to return to D.C." On January 10, Individual-1 asked, "If they call what are you

gonna tell them? So I know what to tell them if they call me." Tenney replied, "I'm gonna say I wasn't in and I'm not talking." They discussed the FBI's investigation.

### V.  Tenney Minimizes His Conduct in FBI Interviews

On February 9, 2021, the FBI visited Tenney's residence and interviewed him. Tenney admitted he went inside the Capitol Building and described what he was wearing that day. He acknowledged his affiliation with the PowerHouse Patriot Facebook page and admitted that video content had been removed from that page in the days following January 6. Tenney otherwise minimized his conduct and provided inaccurate information. He said he entered approximately 45 minutes to one hour after the initial breach and saw no barricades or police presence until he got inside (as described above, video evidence shows Tenney confronting police outside the Parliamentarian Door before he entered the building). Tenney said that he was only in the building for three or four minutes before he realized something bad was happening, prompting him to leave. He also said that a SWAT-uniformed officer told him that "we need people like you to help get everyone out." Tenney claimed that he told people to stop damaging things and helped lift fallen officers back to their feet. He declined to give the FBI the names of anyone who would corroborate his story.

On January 31, 2022, several months after his indictment, Tenney participated in a proffer session with FBI, where he was shown video of his conduct. He claimed he had attempted to open the Rotunda Doors only because he was concerned that rioters outside the door were getting injured.

### PROCEDURAL BACKGROUND

On October 22, 2021, a federal grand jury returned an indictment charging Tenney with Civil Disorder in violation of 18 U.S.C. § 231(a)(3), Obstruction of an Official Proceeding in

violation of 18 U.S.C. § 1512(c)(2), Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1), Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Engaging in Physical Violence in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(4), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), Act of Physical Violence in the Capitol Grounds or Buildings in violation of 40 U.S.C. § 5104(e)(2)(F), and Parading Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G). (ECF No. 25).

On June 30, 2022, pursuant to an agreement, the defendant pleaded guilty to Count One, Civil Disorder, in violation of 18 U.S.C. § 231(a)(3), and Count Two, Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2). In connection with the plea, the defendant and defense counsel signed a written plea agreement. ECF No. 51.

Among other things, the plea agreement included the parties' agreement on the estimated offense level under the Guidelines. *Id.* ¶ 4. The parties agreed that the total offense level for Count One was 13, using the U.S.S.G. § 2A2.4 guideline to calculate the base offense level for the violation of 18 U.S.C. § 231(a)(3). *Id.* ¶ 4(A). The agreement also stated that the parties agreed that the total offense level for Count Two was at least 17, based on a base offense level of 14 pursuant to U.S.S.G. § 2J1.2(a), and an additional three points for substantial interference pursuant to U.S.S.G. § 2J1.2(b)(2). *Id.* The defendant reserved the right to contest an additional eight-point enhancement under § 2J1.2(b)(1)(B), which the government argued applied because the defendant's conduct caused or threatened physical injury or property damage in order to obstruct the administration of justice. *Id.* The parties further agreed that, assuming the defendant accepted responsibility, a three-level reduction would be appropriate pursuant to U.S.S.G. § 3E1.1. *Id.*

Accordingly, the total estimated offense level would be 22 (if the eight-point enhancement applied under § 2J1.2(b)(1)(B)) or 16 (if it did not). *Id.* The government agreed to dismiss the remaining counts at sentencing, and Tenney acknowledged that the charges to be dismissed were based in fact. *Id.* ¶ 3. The plea agreement allowed either party to "seek a variance and suggest that the Court consider a sentence outside of the applicable Guidelines range, based on the factors to be considered in imposing a sentence pursuant to 18 U.S.C. § 3553(a)." *Id.* ¶ 6.

Tenney agreed to several express waivers as part of the Plea Agreement. He waived his appellate rights, except to appeal an illegal or above-guidelines sentence, or to claim that he received ineffective assistance of counsel. *Id.* ¶ 9(D). Tenney also waived any right to challenge his convictions in a collateral attack, including a motion brought under § 2255, except to the extent that such a motion was based on newly discovered evidence or on a claim that he received ineffective assistance of counsel. *Id.* ¶ 9(E).

Judge Hogan sentenced Tenney on December 5, 2022. The government asked for a 48-month sentence, and Tenney requested a sentence of probation. At the hearing, Judge Hogan heard argument on the applicability of the +8 enhancement. Tenney contended that his physical contact with officers was not "intended to cause physical harm," so the enhancement did not apply. Sent. Tr. 7; *see also id.* at 5.

The government's response highlighted several aspects of Tenney's violent conduct. Chief among them were Tenney's attacks on officers. Narrating the video, the government explained:

> So then J.G., the House Sergeant at Arms, runs up to Mr. Tenney, pushes him out of the way. Mr. Tenney comes back, and he gets in J.G.'s face; he's jabbing his finger at him, which alone is a threat. And then, at 32 seconds into the video, he pushes the officer into the door frame... he ends up with his arms locked with B.A.'s outside . . . They walk in together, he pushes B.A. away. . . As Your Honor noted, then we have another Capitol Police officer, J.G., come through the door, and he shoves him to the side into another rioter. Shoving an officer and

changing his course of travel like that, especially when you are pushing them into someone else, in a crowded area like that, of course that's the kind of action that threatens to cause injury.

*Id.* at 14-15.

The government also described how Tenney threatened to damage the Rotunda Doors, approaching them and throwing his weight against them at least four times, which could have jammed them. *Id.* at 16. The government further explained how Tenney's gestures and words during the Rotunda Doors incident underscored the violent nature of his actions, such as when Tenney pointed his finger at an officer and loudly declared "We are one of you!": "He says it so forcefully, the implication is: We know what is best; we are the ones in control here; you need to stand aside. That statement is not mitigating; that statement is actually a threat." *Id.* at 18.

Tenney's statements before January 6, moreover, framed how the Court should understand Tenney's intent inside the Capitol, the government explained. He had sought information on joining a militia. *Id.* at 19. In contrast to defendants who claim they were swept up in the moment, Tenney anticipated, before January 6, that "we may siege the Capitol Building and Congress if the electoral votes don't go right." *Id.* He thought "domestic war and siege" were imminent because "Pence is a traitor and will betray the U.S. on the 6th." *Id.* The government summarized: "He thought America was in a struggle for its life, and he was not going to let a couple of officers stand in his way." *Id.* at 20.

After hearing these arguments and reviewing the videos, Judge Hogan agreed with the government and applied both the +3 and +8 enhancements to the obstruction count. *Id.* at 20. He found that, as a matter of law, causing or threatening injury to obstruct the "administration of justice" could encompass efforts to obstruct the Joint Session on January 6. *Id.* He explained, Tenney's "efforts certainly consisted of causing or threatening to cause physical injury and,

essentially, property damage as well." *Id.* at 21-22. Addressing the video, Judge Hogan observed, "there is no question that he was in contact with the police officers, there was physical contact; that his mannerisms were threatening; his intent to continue to go back to push the doors open to let more people in; he's encouraging the rioters to come in, patting them on the back." *Id.* at 20. Judge Hogan accordingly calculated that at a level 22, Tenney's guidelines range was 41-51 months.

The parties then allocuted, and Tenney's fiancée, who had met him four months after the riot, also spoke.[2]  In his allocution, Tenney said he was taking responsibility for his actions, and recognized how "January 6th as a whole caused law enforcement to get hurt," but claimed he had opened the Rotunda Doors because he saw people outside being "smushed" against them. *Id.* at 35-36.

Judge Hogan then applied the Section 3553(a) factors, including the seriousness of the offense, Tenney's lack of criminal history and personal characteristics, and the need to avoid unwarranted sentence disparities. He noted that Tenney had no criminal background and credited Tenney's expressions of remorse. *Id.* at 42. He also found, though, that "you were plotting to come up here -- plotting to, basically, have a riot and try to take over the Capitol and to stop the Electoral College proceeding -- in other words, to have a revolution against the government of the United States -- and afterwards you continued that, at least for several weeks, until the FBI came." *Id.* at 42-43. Judge Hogan further noted that the riot was a "blight on our history and our country that will never go away." *Id.* at 43. Judge Hogan expressed "concern" that Tenney had claimed during

---

[2] In connection with his sentencing, Tenney submitted a written statement. "I have lost so much already because of my stupidity and arrogance" and "I let one man's rhetoric and lies bring me to a place that couldn't be more far from reality." ECF No. 74-1 at 1. He admitted, "I let false claims…cause fear and anger inside me." *Id.*

sentencing that he was trying to "help people" pressed against the door by opening it, as those people were trying to break in, and Tenney ignored the police's clear direction, returning to the door to try to force it open even after police had tried to close it – actions that helped many rioters to enter the building, who then caused further damage and injury. *Id.* Judge Hogan told Tenney that "I accept your fiancée's statement of what kind of person you are now; she's gotten to know you. I am glad to see this change; you have a new family and are starting life over." *Id.* at 44. However, he followed, "We cannot let this go and simply tell people: You have a slap on the wrist; it's okay to riot, it's okay to attack people." *Id.* He then described at length the injuries suffered by police officers that day: "almost 140 had serious injuries and had to get treated, are still recovering and never went back to work; one had a heart attack, was seriously injured, and retired." *Id.* He further recalled:

> people cowering in their offices hiding when the rioters are marching down saying they are looking for people; they are looking for Pelosi; they want to hang Pence. They were having to hide in closets for hours, very near these rioters, thinking they're going to be killed. I mean, the harm that was done to other people and the harm done to our country -- I don't think there is any way to pay for that -- recover from that.

*Id.* at 45. Having reviewed the Section 3553(a) factors, Judge Hogan explained that he was going to vary downward to avoid sentence disparities. *Id.* at 45. He imposed concurrent 36-month sentences on Count One and Count Two, five months below the low end of the Guidelines, followed by 36 months of supervised release. *Id.* at 46. He did not impose a fine, and ordered the $2,000 restitution agreed to be the parties. *Id.* at 48. He granted the government's oral motion to dismiss the remaining counts. *Id.* at 52.

Judge Hogan further advised Tenney regarding his right to appeal. He told Tenney, "You have a right to appeal the sentence if I imposed a longer imprisonment than the statutory maximum,

which I did not -- it's a much greater maximum -- or if I departed upward from the guideline range that I found applied; I did not." *Id.* at 51. Judge Hogan told Tenney he did have a right to appeal his calculation of the Guidelines range to include the +8 enhancement under U.S.S.G. § 2J1.2(b)(1)(B): "I did, however, overrule an objection to the guideline range; so I gave you a longer range than if I accepted the guideline range your counsel suggested, and you have a right to appeal that." *Id.*

Judge Hogan also again advised Tenney as to his limited rights to file a collateral attack on the sentence: "Additionally, under 28 U.S.C. § 2255, you have a right to challenge this conviction or the sentence imposed if you find new and currently unavailable information that becomes available to you that you don't know about now or if you claim you received ineffective assistance of counsel, that is, not good legal advice in entering a plea of guilty, or the sentence; and the cost of any appeal can be waived." *Id.* at 51.

The judgment issued on December 7, 2022. *Id.* Tenney did not file any direct appeal.

On March 1, 2024, the D.C. Circuit issued its opinion in *United States v. Brock,* 94 F.3d 39 (D.C. Cir. 2024) which found that the three-point enhancement for substantial interference with the "administration of justice" under U.S.S.G. § 2J1.2(b)(2) does not apply to interference with the legislative process of certifying electoral votes. *Id.* at 42. The government agrees that, under the logic of *Brock*, the eight-point enhancement under U.S.S.G. § 2J1.2(b)(2) also does not apply to defendants who caused or threatened injury to obstruct the Joint Session on January 6.

On November 27, 2023, Tenney filed a *pro se* motion to reduce his sentence under Amendment 821, part B, asking for a two-point reduction as a "first time, non-violent offender." ECF No. 81. The Court held Tenney's motion in abeyance. On April 11, 2024, Tenney filed a

§ 2255 motion challenging the imposition of the +8 and +3 enhancements under U.S.S.G. §§ 2J1.2(b)(1)(b) and 2J1.2(b)(2) under *Brock* and again raising Amendment 821.

### LEGAL STANDARD: RETROACTIVE APPLICATION OF U.S.S.G. § 4C1.1

U.S.S.G. § 4C1.1 (Amendment 821, part B to the Sentencing Guidelines) provides for a two-level reduction for offenders with no criminal history points who are not subject to any of ten exclusionary criteria, including that the defendant did not use violence or credible threats of violence in connection with the offense (§ 4C1.1(3)).

Section 4C1.1 may be applied retroactively to previously sentenced inmates, pursuant to U.S.S.G. § 1B1.10. Such a reduction may occur as provided in 18 U.S.C. § 3582(c)(2), which provides:

> [I]n the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(o), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Accordingly, a reduction pursuant to U.S.S.G. § 1B1.10 is not mandatory. Instead, a "court *may* reduce the term of imprisonment, after considering the factors set forth in section 3553(a)." 18 U.S.C. § 3582(c)(2) (emphasis added). Additionally, any proceeding under Section 3582(c)(2) is not a full resentencing, so a court is not permitted to reconsider other sentencing determinations left unaltered by the Section 4C1.1 amendment. *Dillon v. United States*, 560 U.S. 817, 825-826 (2010); U.S.S.G. § 1B1.10(a)(3).

A court considering a motion for a sentence reduction due to § 4C1.1 must follow a two-step process. *Id.* at 826. First, the court must determine whether the defendant is eligible for a sentence reduction. A defendant is only eligible under § 4C1.1 reduction if: (1) the defendant has

no criminal history points; (2) the defendant is not subject to any of the exclusionary criteria; (3) the amended guidelines range is lower than the range applied at the original sentencing hearing; and (4) the defendant did not previously receive a sentence at or below the bottom of the now-amended range other than for providing substantial assistance. *See* U.S.S.G. §§ 1B1.10, 4C1.1; *Dillon v. United States*, 560 U.S. at 827.

Even if step 1 is satisfied, a sentencing reduction is not required. Instead, § 1B1.10 directs that before reducing a defendant's sentence, the court must "consider the factors set forth in 18 U.S.C. § 3553(a) in determining … whether a reduction in the defendant's term of imprisonment is warranted" as well as "the extent of such a reduction." U.S.S.G. § 1B1.10 app. note 1(B)(i), (ii); *see also id.* Background ("The authorization of such a discretionary reduction ... does not entitle a defendant to a reduced term of imprisonment as a matter of right.").

In particular, the court must consider public safety considerations, and may consider information regarding the post-sentencing conduct or situation of the defendant, whether positive or negative. *See*, *e.g.*, *United States v. Darden*, 910 F.3d 1064, 1068 (8th Cir. 2018). Section 1B1.10 application note 1(B)(ii) directs that "[t]he court shall consider the nature and seriousness of the danger to any person or the community that may be posed by a reduction in the defendant's term of imprisonment." Application note 1(B)(iii) further directs that "[t]he court may consider post-sentencing conduct of the defendant that occurred after the imposition of the original term of imprisonment." That means the court may, but is not required, to consider the defendant's post-sentencing rehabilitation, if any. *See United States v. Rodriguez-Rosado*, 909 F.3d 472, 481 (1st Cir. 2018); *United States v. Banderas*, 858 F.3d 1147, 1150 (8th Cir. 2017). Such conduct would include social media posts and other statements relating to the Capitol riot on January 6, 2021.

If the court decides in its discretion to grant a reduction in sentence, it generally may not reduce the term of imprisonment to a term that is less than the minimum of the new guideline range. U.S.S.G. § 1B1.10(b)(2)(A). Thus, the court may not reduce the sentence below the range provided by the amended guideline, and "in no event may the reduced term of imprisonment be less than the term of imprisonment the defendant has already served." U.S.S.G. § 1B1.10(b)(2)(C).

## LEGAL STANDARD UNDER § 2255

Under 28 U.S.C. § 2225, the Court can discharge or resentence a prisoner if (1) the sentence was imposed "in violation of the Constitution or laws of the United States"; (2) the court lacked jurisdiction to impose the sentence; (3) the sentence "was in excess of the maximum authorized by law"; or (4) the sentence is "otherwise subject to collateral attack." 28 U.S.C. § 2255(a). The scope of relief does not reach "every asserted error of law." *Davis v. United States*, 417 U.S. 333, 346 (1974). Rather, § 2255 provides relief for jurisdictional and constitutional claims, as well as for certain nonconstitutional claims. Relief under § 2255 is an extraordinary remedy and is generally only granted "if the challenged sentence resulted from 'a fundamental defect which inherently results in a complete miscarriage of justice,' or 'an omission inconsistent with the rudimentary demands of fair procedure.'" *United States v. Pollard*, 959 F.2d 1011, 1020 (D.C. Cir. 1992) (*quoting Hill v. United States*, 368 U.S. 424, 428 (1962)). The defendant carries the burden of sustaining his contentions by a preponderance of the evidence. *United States v. Simpson*, 475 F.2d 934, 935 (D.C. Cir. 1973). It is "well-settled" that "to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982); *see also Pollard*, 959 F.2d at 1020 (citing *Frady*).

While the D.C. Circuit has not yet addressed the question, every court of appeals to consider the issue has determined that a claim that a sentencing court erroneously computed an

advisory guidelines range is not cognizable on collateral review. *See United States v. Foote*, 784 F.3d 931, 932, 935, 940 (4th Cir.), *cert. denied*, 576 U.S. 1027 (2015) (No. 14-9792); *United States v. Coleman*, 763 F.3d 706, 708-709 (7th Cir. 2014), *cert. denied*, 575 U.S. 923 (2015) (No. 14-8459); *Spencer v. United States*, 773 F.3d 1132, 1135-1137 (11th Cir. 2014) (*en banc*), *cert. denied*, 576 U.S. 1023 (2015) (No. 14-8449); *see also United States v. Hoskins*, 905 F.3d 97, 104 n.7 (2d Cir. 2018) ("Several circuits have concluded that sentences imposed pursuant to advisory Guidelines based on an erroneous or later invalidated career offender determination did not result in a complete miscarriage of justice sufficient to warrant collateral relief."), *cert. denied*, 140 S. Ct. 55 (2019) (No. 18-8636); *see also United States v. Santay-Rosales*, No. 20-CR-243-RCL-2, 2023 WL 5221249, at *4 n.1 (D.D.C. Aug. 15, 2023); *United States v. Folk*, 954 F.3d 597, 604 & n.7 (3d Cir. 2020) (agreeing and collecting more cases); *Shepherd v. Unknown Party, Warden, FCI Tucson*, 5 F.4th 1075, 1078 (9th Cir. 2021).

## ARGUMENT

### I.   NO SENTENCING REDUCTION IS WARRANTED UNDER AMENDMENT 821

#### A.   Tenney is not eligible for a reduction under § 4C1.1.

Tenney is not eligible for the sentencing reduction under the Section 4C1.1 amendment because he "used violence or credible threats of violence" in connection with his offenses on January 6. U.S.S.G. § 4C1.1(a)(3). Tenney assaulted three officers – pushing, shoving, jabbing his finger at them, yelling or speaking heatedly in their faces – and threatened to break down the Rotunda Doors. Specifically, he (1) pulled Sergeant at Arms employee J.G. by the shoulder, pushed him into the door frame, while exclaiming in J.G.'s face and jabbing his finger at him as J.G. sought to protect the Rotunda Doors; (2) locked arms with Officer B.A. and pushed him away; (3) shoved Officer J.G. to the side into a rioter; (4) threw his body weight against the Rotunda

Doors at least four times to try to break them open; and (5) threatened officers with his body language and words, yelling "Stand up, Patriots, stand up!" and "we are one of you!"  Tenney's contention that he was "nonviolent" is wrong.

This Court has cited Judge McFadden's definition of violence, which includes "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm," or "the "exertion of any physical force so as to injure or abuse." *United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 4-5*; see also United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (citing this definition). Judge McFadden further defined a "credible threat of violence" as "a believable expression of an intention to use physical force to inflict harm." *Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 6. When examining whether the defendant's conduct posed a credible threat of violence, the Court should consider the totality of the circumstances surrounding that conduct:

> In evaluating whether credible threats of violence were posed by the defendant's offense conduct, to my mind, the context matters very critically. In other words, evaluating a defendant's offense conduct requires examination of all the factors of the offense including what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions.

*United States v. Andrulonis,* No. 23-cr-085 (BAH), Sent. Tr. at 11-12.

Tenney's conduct easily fits these definitions. He assaulted three officers. That should end the inquiry. Mapping his conduct to Judge McFadden's definitions, he personally used "physical force" against these officers when he shoved or pushed them. It was force "accompanied by fury, vehemence, and outrage." Tenney's social media statements reflect a belief that the country had been betrayed and that the country had been plunged into civil war. These extreme beliefs reflected the outrage Tenney felt, the outrage upon which he acted that day. Tenney's statements captured

on video manifest fury. He shouted at officers ("we are one of YOU!"), threateningly pointed and jabbed his finger at officers, and sought to instigate others ("Stand up, patriots!  Stand up!"). As Judge Hogan found in applying the +8 enhancement, moreover, Tenney threatened to cause injury by his conduct. In addition using violence, Tenney also communicated a credible threat of violence to engage in still further attacks. And Tenney attempt to force open the Rotunda Doors by throwing his body weight against them, demonstrating that his conduct also involved violence or threats of violence toward property, yet another basis to deny the reduction here.

In analogous cases – where rioters shoved officers – judges have rejected the application of 4C1.1. Similarly, in *United States v. Reyher,* 23-cr-138 (RBW), another 18 U.S.C. § 231(a)(3) conviction, Judge Walton judge found that using one's body to push into officers was violent conduct. Feb. 27, 2024 Sent. Tr. at 16 (transcript provided separately); *see also United States v. Zerkle,* 22-cr-100 (RBW), Feb. 22, 2024 Sent. Tr. at 18-19 (reduction inappropriate "when you cause your body to come in contact with another body and you do it with force") (transcript provided separately); Nov. 21, 2023 Minute Order, *United States v. Hernandez,* 22-cr-42 (CRC) (conduct included joining a group push against officers).

### B.  Even if the Court determines that § 4C1.1 applies, it should not reduce Tenney's sentence.

"The grant of authority to the district court to reduce a term of imprisonment is unambiguously discretionary," even when the guideline range is actually reduced. *United States v. Vautier*, 144 F.3d 756, 760 (11th Cir. 1998). A district court has "substantial discretion" in deciding whether to reduce a sentence. *United States v. Young*, 555 F.3d 611, 614 (7th Cir. 2009). Accordingly, many courts have denied sentence reductions even in situations where guideline amendments lowered the sentencing ranges. *See, e.g.*, *United States v. Strand*, 21-cr-085 (CRC), ECF No. 150 at 7-8; *United States v. Wilson*, 716 F.3d 50, 53 (2d Cir. 2013).

Here, the Section 3553(a) factors counsel against granting a sentence reduction. Tenney could not plausibly argue that he was suddenly caught up in the moment. He expressly contemplated sieging the Capitol before January 6 and discussed bringing weapons and joining a militia. He assaulted three officers, shoving one into a rigid doorframe. He was the very first rioter to breach the Rotunda Doors, and enabled others to do the same. When he opened those doors from the inside, he personally caused a hugely consequential breach that allowed dozens of rioters to enter and emboldened the angry crowd outside to continuously fight to breach that door, as happened at least three times on January 6. This all occurred, of course, against the backdrop of the violent riot that took aim at the peaceful transfer of power, an intent Tenney shared.

A 36-month sentence is, if anything, a lenient sentence for a person who assaulted three officers while causing a major breach of the Capitol that disrupted the peaceful transfer of power. The small number of January 6 rioters who so directly enabled such consequential breaches have been sentenced accordingly. Daniel Scott, for example, charged officers beneath the northwest scaffolding, leading the breach of the police line on the West Front and allowing rioters to reach the Upper West Terrace; he was sentenced to 60 months despite having personal circumstances similar to Tenney's. *United States v. Scott,* 21-cr-292-2 (RCL). Dominic Pezzola broke the window next to the Senate Wing Door that led to the initial breach of the building; he was sentenced to serve ten years. *United States v. Pezzola,* 21-cr-175 (TJK). Tenney helped the mob take over the Capitol Building as few others did that day. His sentence is also entirely appropriate for an individual who attacked multiple officers.

Moreover, Judge Hogan already expressly acknowledged Tenney's lack of criminal history when discussing the Section 3553(a) factors. He already credited Tenney's expression of remorse and account of how he had changed his life, and he already varied downward. He did so even

though Tenney continued to minimize his conduct, maintaining the implausible claim that he was trying to help rioters "smushed" against the door – a claim belied by the video, and a claim that does not explain his confrontations with officers B.A. and J.G., which occurred after the doors were open. The Court should not adjust Tenney's sentence further downward under § 4C1.1.

Finally, the government notes that the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

Thus, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless deny a sentence reduction. Such treatment would recognize the seriousness of Tenney's multiple physical confrontations with officers and calculated effort to disrupt the certification, the unique nature of the criminal events of January 6, 2021, and the overwhelming need to ensure future deterrence.[3]

---

[3] If the Court does decide in its discretion to grant the defendant's motion, the government requests that the Court delay release by 10 days in order to allow time for the Bureau of Prisons to process the release, as recommended by the Committee on Criminal Law of the Judicial Conference of the United States in its January 25, 2024 memorandum.

## II.      THE COURT SHOULD DENY TENNEY'S SECTION 2255 MOTION

### A. Challenges to the Computation of the Advisory Guidelines Range Are Not Cognizable on Habeas Review

Tenney further seeks relief under Section 2255, raising three grounds: he again raises his claim under U.S.S.G. § 4C1.1 (ground one), and he argues that Judge Hogan erred by applying the +3 and +8 enhancements to his sentence under U.S.S.G. §§ 2J1.2(b)(2) and 2J1.2(b)(1)(B) (grounds two and three) (the "sentencing-enhancement claim"). None of these Guidelines issues are cognizable on habeas review.

A retroactive § 4C1.1 claim like Tenney's arises under 18 U.S.C. § 3582(c), and a proceeding under 3582(c) does not permit consideration of other sentencing determinations or collateral attacks. In *Hamilton v. United States*, 67 F.3d 761, 764 (9th Cir. 1995), the Ninth Circuit reviewed a habeas petition arguing that the defendant should be resentenced based on a retroactive amendment to the guidelines. The district court agreed with the defendant and resentenced him. On appeal, the government argued that the district court had lacked jurisdiction under 28 U.S.C. § 2255 to resentence the defendant and he should have brought his action pursuant to 18 U.S.C. § 3582(c)(2). The Ninth Circuit agreed with the government, saying that while § 2255 is broad, it does not encompass all claimed errors in sentencing. Because a motion to reduce a sentence pursuant to a Guidelines amendment raises neither a claim of constitutional nor jurisdictional error, a habeas petition was not the proper vehicle for it. The Ninth Circuit cited *United States v. Towe*, 26 F.3d 614 (5th Cir.1994) in support of its holding, as well *Rodriguez–Alonso v. United States*, 807 F. Supp. 21, 22 (E.D.N.Y. 1992) (relief available under 18 U.S.C. § 3582, and not 28 U.S.C. § 2255, for defendant sentenced under guideline that was later amended to provide a lower offense level).

For similar reasons, Tenney's claim that Judge Hogan erroneously calculated the +3 and +8 sentences is also not the proper subject of a motion under 28 U.S.C. § 2255. Such challenges may not be addressed on collateral review because an erroneous computation of an advisory guidelines range does not alter the statutory minimum or maximum sentences that define the boundaries of the sentencing court's discretion. At all times, those boundaries remain fixed by Congress. *See Mistretta v. United States*, 488 U.S. 361, 396 (1989). "So long as a district court considers the § 3553(a) factors and imposes a sentence within the statutory limits for an offense, the criminal proceeding will not be 'infected with any error of fact or law of the 'fundamental' character." *Folk*, 954 F.3d at 605 (citing *United States v. Addonizio*, 442 U.S. 178, 186 (1979) (denying collateral relief for claim of sentencing error based on Parole Commission's post-sentencing adoption of release guidelines, which affected the sentencing court's expectation of the time the defendant would serve in custody, because the actual sentence imposed was "within the statutory limits" and the error "did not affect the lawfulness of the judgment itself," but only how the judgment would be performed)). "Such a sentence is lawful and cannot be a complete miscarriage of justice" warranting collateral relief. *Folk*, 954 F.3d at 605. As described above, every court of appeals to consider the issue has determined that a claim that a sentencing court erroneously computed an advisory guidelines range is not cognizable on collateral review. *See Foote*, 784 F.3d at 932, 935, 940, *cert. denied*, 576 U.S. 1027 (2015); *Coleman*, 763 F.3d at 708-709, *cert. denied*, 575 U.S. 923 (2015); *Spencer*, 773 F.3d at 1135-1137, *cert. denied*, 576 U.S. 1023 (2015); *see also Hoskins*, 905 F.3d at 104 n.7 ("Several circuits have concluded that sentences imposed pursuant to advisory Guidelines based on an erroneous or later invalidated career offender determination did not result in a complete miscarriage of justice sufficient to warrant collateral relief."), *cert. denied*, 140 S. Ct. 55 (2019); *see also Folk*, 954 F.3d at 604 & n.7

(agreeing and collecting more cases); *Shepherd*, 5 F.4th at 1078. "Because the Guidelines are advisory and merely one factor considered within a sentencing court's discretion," and because Tenney's sentence was lawful, his claims of Guidelines error do not warrant relief. *Folk,* 954 F.3d at 606 (holding that a claim of error in a career-offender designation under the Sentencing Guidelines was not cognizable under Section 2255). To hold otherwise, and to allow any defendant to seek habeas relief based on a claim that the Guidelines were miscalculated in some way, would undermine finality and "make the limited relief offered by § 2255 a boundless opportunity for criminal defendants to re-challenge their sentences." *Id.* at 607.

### B.  Tenney's Plea Agreement Waived His Sentencing-Enhancement Claim

Tenney's plea agreement also bars his claims. "[T]he express terms of [his] plea agreement preclude him from collaterally attacking his conviction on any grounds except for ineffective assistance of counsel. That plea agreement was accepted by the Court." *United States v. Santay-Rosales*, No. 20-cr-243-RCL-2, 2023 WL 5221249, at *4 (D.D.C. Aug. 15, 2023). Here, in exchange for defendant's guilty plea, the United States agreed not to pursue additional charges and agreed to dismiss the other pending charges against Tenney, including a charge under 18 U.S.C. § 111(a)(1). Plea Agreement, ¶ 3. In accepting the plea bargain, defendant waived his right to file a collateral attack, except to the extent that such a § 2255 motion was based on "newly discovered evidence" or ineffective assistance of counsel. Plea Agreement, ¶ 9(E); *see United States v. Garcia-Santos*, 273 F.3d 506, 509 (2d Cir. 2001) (noting that defendants receive "important benefits" from collateral attack waivers because such waivers are "part of the bargain by which defendants "receive[] exemption from prosecution for other crimes" and other plea agreement benefits). Tenney's claims do not involve newly discovered evidence or allegations of ineffectiveness. He does not argue that his waiver was not knowing, intelligent, and voluntary, and

he has not shown that the waiver is otherwise unenforceable. The Court should therefore enforce the waiver and not entertain his claims. *See United States v. Thomas*, 999 F.3d 723, 729 (D.C. Cir. 2021) (internal citation and quotation marks omitted); *United States v. Guillen*, 561 F.3d 527, 530 (D.C. Cir. 2009) (enforcing waiver provision in plea agreement).

### C.  The One-Year Bar Precludes Tenney's Sentencing-Enhancement Claim

Motions under § 2255 are subject to a "1-year period of limitation." 28 U.S.C. § 2255(f). The limitation period runs from the latest of several possible dates.

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f). Tenney's sentencing-enhancement claim is untimely under each. He signed his petition on March 27, 2024. ECF No. 82 at 14.[4]  That is more than a year after his judgment of conviction became final (December 21, 2022, or fourteen days after judgment was entered against him, which he did not appeal). ECF No. 78. No illegal government action prevented him from making a motion. 28 U.S.C. § 2255(f)(2). There has been no new right "recognized by the Supreme Court," let alone one made retroactive; rather, the D.C. Circuit's ruling on a guidelines issue in *Brock* is what precipitated the motion. *Id*. § 2255(f)(3).

---

[4] Tenney's filing does not indicate a date of mailing, but it was untimely even as of the date it was signed.

Tenney's claim is also untimely under 28 U.S.C. § 2255(f)(4). Tenney was aware that the application of the +3 and +8 enhancements were disputed at the time of sentencing. He obtained the government's agreement to leave the +8 enhancement open to argument, reflecting the fact that the issue was unsettled. Before Tenney's sentencing, Judge McFadden had issued a written opinion finding neither the +3 nor the +8 enhancements could apply as a matter of law, which the government cited and addressed at length in its sentencing memorandum in this case. *See* ECF No. 73 at 42-28 (discussing *United States v. Seefried*, No. 21-cr-287, ECF No. 123, at 1 (D.D.C. Oct. 29, 2022) (TNM).  Therefore, even the time period under § 2255(f)(4) should run from the date that judgment became final Tenney: December 21, 2022.  The one-year period thus expired on December 21, 2023, more than a year before he signed his motion.

### D.  Tenney Procedurally Defaulted His Claims By Not Filing a Direct Appeal

Tenney's claims, which are not predicated on ineffective assistance of counsel, are also procedurally defaulted because he did not file a direct appeal before seeking relief under Section 2255. *Massaro v. United States*, 538 U.S. 500, 504 (2003). Where a defendant fails to appeal an alleged trial or sentencing error, he is procedurally barred from raising the claim in a later collateral attack unless he shows cause for his failure to do so and prejudice as a result of his failure. *See Bousley v. United States*, 523 U.S. 614, 621-22 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal."); *United States v. Hicks*, 911 F.3d 623, 627 (D.C. Cir. 2018); *United States v. Pettigrew*, 346 F.3d 1139, 1144 (D.C. Cir. 2003).

To establish cause, a defendant must demonstrate "some objective factor external to the defense [that] impeded counsel's efforts to raise the claim," such as government interference or that the factual or legal basis for the claim was not reasonably available. *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991) (internal quotation omitted). In addition, a defendant must show "'actual

prejudice' resulting from the errors of which [he] complains." *Frady*, 456 U.S. at 168. That is, a defendant must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 170. A defendant "bears the burden of showing both" cause and actual prejudice. *Hicks*, 911 F.3d at 627.

Tenney cannot meet this standard. While the D.C. Circuit just recently rejected the application of the enhancement in the January 6 context in *United States v. Brock,* its decision in *Brock* is not the type that gives cause to excuse a default.  A defendant can show cause where a claim "is so novel that its legal basis [was] not reasonably available to counsel" at the time of appeal. *Bousley v. United States*, 523 U.S. 614, 622 (1998) (*quoting Reed v. Ross*, 468 U.S. 1, 16 (1984)); *see also United States v. Sumner*, 597 F. Supp. 3d 120, 134–35 (D.D.C. 2022). As described above, the applicability of the enhancements was an open question in the D.C. Circuit at the time of Tenney's sentencing, and judges in the district had disagreed, as the government identified in its sentencing memo, his counsel actually did raise the +8 objection, and Judge Hogan advised Tenney at sentencing that he could appeal that finding, so Tenney lacks cause to excuse his failure to appeal the imposition of the +8 enhancement. Sent. Tr. at 41; *Frady*, 456 U.S. at 167–68.

Tenney's claim under Amendment 821 is also not properly before the Court on habeas review. Tenney filed a letter raising this motion in the district court, and the district court has not yet ruled upon the motion. While this claim is not cognizable on habeas review, even if it were, it would not be ripe, because the district court has not even addressed Tenney's motion in the first instance (and he has not filed a direct appeal of any ruling). There is obviously no cause for his

failure to file a direct appeal where he himself is aware of the grounds for relief and filed a motion in district court, whose denial he will be free to appeal, should he choose.

### E.  Tenney's Claims Are Meritless

Finally, even were the Court to reach the merits of Tenney's Section 2255 claims, and resentence Tenney, it should not reduce his sentence. The government has explained above why Tenney's request to reduce his guidelines range under U.S.S.G. § 4C1.1 lacks merit. As to Tenney's sentencing-enhancement claim, while the government concedes that his sentence should not have included either the +3 or the +8 enhancements under *Brock*, were the Court to resentence Tenney, it should impose the same 36-month sentence, weighing the Section 3553(a) factors.

"[U]pon a resentencing occasioned by a remand, unless the court of appeals expressly directs otherwise, the district court may consider . . . such new arguments or new facts as are made newly relevant by the court of appeals," including the application of an "upward variance." *United States v. Miller*, 35 F.4th 807, 815 (D.C. Cir. 2022). Thus, even if the enhancements under Guidelines § 2J1.2(b)(1)(B) and § 2J1.2(b)(2) do not apply, the Court impose the same sentence by varying upward under the Section 3553(a) factors.

As explained above, Judge Hogan carefully balanced the 3553(a) factors to arise at the appropriate sentence, which was 36 months. Without the two +3 and +8 sentencing enhancements, Tenney's Guidelines would be level 13 (12-18 months), but he should still receive a 36-month sentence to account for the fact that attacked multiple officers as part of playing a crucial role enabling the breach of the Capitol that disrupted the peaceful transfer of power.[5]  The context of

---

[5] Tenney's offense level for the 18 U.S.C. § 1512(c)(2) conviction would be level 14. His offense level for Count One (the 18 U.S.C. § 231(a)(3) conviction) would be 13, assuming the Court calculates it under U.S.S.G. § 2A2.4 (as the parties agreed to in the plea agreement) and does not apply the U.S.S.G. § 2A2.2 cross-reference. The offenses would not group, so the total offense level would be 16. Removing three levels for acceptance of responsibility, the total offense level would be 13.

Tenney's attack, moreover, clearly and rightfully weighed on Judge Hogan. Sent. Tr. at 43-45 ("the harm that was done to other people and the harm done to our country -- I don't think there is any way to pay for that -- recover from that. It just -- I cannot express, I think, strong enough how bad this conduct was by the rioters.").

Addressing a motion for release pending appeal based on the *Brock* ruling, Judge Friedrich recently found that an upward variance for a Section 1512(c)(2) conviction could be justified, despite *Brock*. *United States v. Reffitt,* 21-cr-32, ECF No. 182 at 9. That is because the eleven-level reduction that a post-*Brock* defendant receives in his 2J1.2 calculation hinges on a technical interpretation of the phrase "administration of justice" in the Guidelines. There is no good reason to treat a disruption of a proceeding to ensure the peaceful transfer of power eleven levels more leniently than a disruption of a judicial proceeding. As Judge Friedrich explained:

> Following *Brock*, obstructive conduct is subject to a potential 11-point Guidelines swing depending on whether it interfered with, on one hand, a "judicial, quasi-judicial, and adjunct investigative proceedings," or on the other hand, any other type of formal proceeding. *Brock*, 94 F.4th at 51. This disparity—though tracking the Guidelines' text—does not reflect the importance and solemnity of the Congressional proceeding to certify the electoral vote count, nor does it reflect the gravity of Reffitt's obstructive conduct.

*Reffitt,* 21-cr-32, ECF No. 182 at 10. "Indeed, as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill "judicial, quasi-judicial, and adjunct investigative proceedings." *Id.*; *see also United States v. Hale-Cusanelli,* No. 21-cr-37 (TNM)*, ECF No. 120 ("Regardless of whether the 'administration of justice' language actually applies to this situation, I have no doubt that the Commission would

---

If the Court were to calculate the Guidelines for Count One under 2A2.2, not 2A2.4, the total offense level would be 18 (level 20 for the civil disorder, level 14 for the obstruction, offense level 21 after grouping; total offense level of 21 before acceptance of responsibility), for a guidelines range of 18-33 months, only slightly below Tenney's 36-month sentence.

have intended for this to apply to substantial interference with an official proceeding like a certification process, which is itself more significant than almost any court proceeding.").

In another January 6 case involving a defendant convicted, like Tenney, of civil disorder and obstruction, Judge Kelly also ruled that he would have imposed the same sentence even without the +8 and + 3 enhancements – in fact, that he would have imposed the same sentence without any obstruction conviction at all:

> During sentencing, the Court made clear that even if Defendant had only been convicted under §§ 231(a)(3) & 2, it would have varied upward and imposed the same 48-month sentence . . . [the Court] did contemplate a scenario in which Defendant's total offense level was 10 and explained that in such a case, 'it would be almost crazy' for the Court not to 'vary up significantly because . . . we've got to capture for deterrence purposes, [] all the other 3553(a) factors.

Memorandum Order, *United States v. Fonticoba*, 21-cr-638 (TJK), ECF No. 81, at 4. Judge Kelly stated that he would vary upward "significantly" even if the defendant were convicted only of civil disorder because of "evidence here of the intent the defendant's conceded, the intent to obstruct the proceeding and the nature of the proceeding itself is so important and so critical." *Fonticoba,* 21-cr-638 (TJK), Jan. 11, 2024 Sent. Tr. at 66-67. Quite simply, it was "a very bad thing if someone tried to obstruct that proceeding." *Id.* at 48.

And, as Judge Friedrich has explained, the need to avoid unwarranted sentencing disparities also favors an upward variance "to avoid disparities between [the defendant's] sentence and those of defendants who interfered with 'what we classically think of as administration of justice.' Sentencing Tr. at 36:9. In other words, [the defendant's] sentence should reflect that he risked greater danger to others' physical safety and the rule of law than a run-of-the-mill defendant subject to the § 2J1.2(b) enhancements." *Reffitt,* No. 21-cr-32, ECF No. 182 at 11.

So too with Tenney. While all who joined the mob on January 6 posed risk to others' physical safety, that is especially true of Tenney, who personally assaulted officers and allowed

46

dozens of unauthorized, unscreened, angry individuals into the Capitol. As in *Fonticoba,* Tenney's post-*Brock* guidelines range encompasses neither the significance of the proceeding he obstructed, nor the scale of the obstruction he caused, nor the violence he used in doing so.

In summary, Tenney's conduct was of the utmost seriousness, as was the Capitol riot itself. He attacked three officers. He contemplated a "siege" of the Capitol before January 6, and then did just that. He instigated one of the two most consequential breaches of the day. The country cannot allow such an attack on the peaceful transfer of power to take place again. His sentence already accounts for his lack of criminal history and any mitigating personal circumstances. 36 months is an appropriate sentence, whether Tenney's guidelines are calculated at level 13 or level 22.

### F.  No Evidentiary Hearing Is Required

Tenney's instant motion warrants neither an evidentiary hearing nor any relief and should be summarily denied. "Evidentiary hearings on § 2255 petitions are the exception, not the norm, and there is a heavy burden on the petitioner to demonstrate that [a] . . . hearing is warranted. An evidentiary hearing is not necessary when a § 2255 petition (1) is inadequate on its face, or (2) although facially adequate is conclusively refuted as to the alleged facts by the files and records of the case." *Moreno-Morales v. United States*, 334 F.3d 140, 145 (1st Cir. 2003); *see also United States v. Pollard*, 959 F.2d 1011, 1030-31 (D.C. Cir. 1992) (only where the § 2255 motion raises "detailed and specific factual allegations whose resolution requires information outside of the record or the judge's personal knowledge or recollection must a hearing be held"); *United States v. Sayan*, 968 F.2d 55, 66 (D.C. Cir. 1992) (no need for hearing in § 2255 proceeding in part because the same judge presided over the original proceedings).

## CONCLUSION

For the reasons stated herein, the existing record is sufficient to show that the defendant is not entitled to relief under 28 U.S.C. § 2255, and he is ineligible for a sentencing reduction under U.S.S.G. § 4C1.1. Accordingly, this Court should deny his motions without a hearing.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

BY:    /s/ Alexis J. Loeb
Alexis J. Loeb
Assistant United States Attorney (Detailed)
CA Bar No. 269895
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
415-436-7200
Alexis.loeb@usdoj.gov